GRAASS, Appellant, vs. WESTERLIN & CAMPBELL COMPANY,
Respondent.

*October 12, 1927—January 10, 1928.*

*Negligence: Duty of one installing complicated machinery to instruct user as to danger: Inadequate instructions: Failure to indicate inherent danger in operation: Contributory negligence: Question for jury.*

1. Under a contract between a Fruit Growers Union and the defendant, employed to install a refrigerating plant, which required the defendant to instruct employees of the Union in the operation of the plant, it was the duty of the defendant to instruct such employees so as to enable them to operate an oil-trap valve in the mechanism to avoid dangers unknown to them, and which, by the exercise of ordinary care, they could not readily anticipate. p. 475.

2. Where the danger attendant upon operating machinery is open and notorious and the mechanism is simple, or where an employee who is to operate it, by reason of experience, has knowledge of the danger, instructions by one who sells and installs such machinery to the employees of the purchaser are ordinarily unnecessary; but where the mechanism is complicated, so that it may not be readily understood and is not understood, and the seller ought to have been cognizant of the danger involved, proper instructions are required. p. 475.

3. Though the contract did not require the defendant to instruct the employees as to the proper operation of the valve, the engineer of the defendant, who assumed to instruct the plaintiff, an employee who was designated by the purchaser to acquaint himself with the mechanism, was under obligations to give him full instructions as to the danger which might result from opening the valve when it became plugged with foreign matter; and in an action by the employee for injuries sustained by the escape of oil from the valve, it was immaterial whether an accident of the same kind had ever occurred in the operation of a similar valve. pp. 477, 478.

4. Evidence that defendant's engineer knew of the conditions giving rise to the danger and failed to give warning and expressly deprecated the danger, made a case for the jury, whose verdict should not be disturbed. p. 478.

5. Evidence that the plaintiff did not know of the conditions causing the danger, that he operated the valve as instructed, and that he had reason to believe that the failure of the valve to

Graass v. Westerlin & Campbell Co. 194 Wis. 470.

work was not due to a defect previously discovered by the defendant's engineer, made the issue of contributory negligence for the jury.  pp. 479, 480.

APPEAL from a judgment of the circuit court for Milwaukee county : JOHN J. GREGORY, Circuit·Judge. *Reversed, with directions.*

The appeal is by the plaintiff from a judgment dismissing plaintiff's complaint with costs.

The action is one to recover damages for personal injuries sustained by the plaintiff on the 1st day of August, 1923, while operating a certain oil-drain valve used in connection with the operation of a refrigerating plant installed by the defendant for the Door County Fruit Growers Union in its plant located at Sturgeon Bay, Wisconsin.   The plaintiff was a man thirty-eight years of age, a high school graduate, possessing some knowledge of and experience with mechanics, but had no knowledge of the operation of a refrigerating plant excepting such as is hereinafter detailed.

When the refrigerating plant was ready for installation by the defendant, the Union, at its own expense, directed the plaintiff to assist in the process of installation, so as to equip himself with some knowledge and experience with respect to the operation of the plant.   The plaintiff therefore, pursuant to the request of the Union, was present while this plant was installed, received instructions from the engineer of the defendant, and assisted the defendant and its employees in performing the necessary work of installation.

It is also clear from the evidence that while the plaintiff knew something about liquid ammonia and its qualities in the form in which it is ordinarily used, he was devoid of any considerable knowledge of the nature and qualities of anhydrous ammonia gas, which is the principal chemical ingredient used in the machinery installed to effect refrigeration. Anhydrous ammonia is more virulent than sulphuric acid, and where, under the circumstances herein described, it holds oil in suspension, it is extremely dangerous to life and limb when it comes in contact with the body.

The sketch herein reproduced and marked "Exhibit A," taken from the brief of the able counsel of the defendant, clearly illustrates the process of refrigeration in this plant:

Graass v. Westerlin & Campbell Co. 194 Wis. 470.

The mechanism and the processes are so clearly and ably set forth in the brief that we take the liberty of quoting therefrom as follows:

"At the right of this drawing is a machine marked compressor. This is a machine by which anhydrous ammonia gas is compressed and forced through the cooling system. From there it is forced under pressure of 140 to 175 pounds per square inch through an upright tank (oil trap) and into coils of pipe, which are known as the condenser coils. The gas is heated as a result of the compression and passes through the condenser coils in order that the heat may be removed. Inside of the condenser coils are pipes containing water. This water absorbs the heat from the ammonia gas and it passes out of the condensers into a receiving tank in liquid form. From this receiver it is forced under pressure through a needle valve in the form of a spray into cooling coils. These coils are located in the rooms used for the cooling of fruit. The expansion of the gas in these coils absorbs heat from the room and lowers the temperature of the room. From the cooling coils the gas is sucked back into the compressor, recompressed, and again forced through the system. . . .

"Between the compressor and the condenser pipes is the oil trap. At the bottom of this oil trap is the valve which the plaintiff was operating at the time he received his injuries.

". . . The ammonia gas, as it is forced into the trap, contains some lubricating oil in suspension. This oil passes by the piston rings of the compressor and is forced out with the gas. The purpose of the oil trap is to eliminate this oil before the gas is forced through the rest of the system. The oil being heavier than the gas, as it is forced against the baffle, congeals and runs down to the bottom of the trap. The gas being lighter is forced up on the other side of the tank and out at the top. The oil is drained from the trap by means of an ordinary globe valve."

When the plant was fully installed, the defendant's engineer remained on duty for a period of ten days for the purpose of observing and supervising the operation thereof and to give instructions to the plaintiff and other employees with respect to its operation, and at the end of that period the

plant was accepted by the Union. On the 1st day of August, 1923, while the plaintiff attempted to drain the oil-drain trap by means of the valve, a large volume of oil held in suspension by anhydrous ammonia gas was suddenly and with great violence forced through the valve and into a pail which had been placed under the valve to receive the oil, with the result that the oil spattered up from the pail onto the ceiling and the surrounding machinery, and came in contact with plaintiff's body and limbs, producing the injuries herein complained of.

The case was submitted to the jury upon a special verdict, wherein it was found: 1. That the oil-trap drain as put upon the refrigerating plant by the defendant was inherently dangerous to life and limb, in view of the use for which it was intended. 2. Such fact was a proximate cause of plaintiff's injury. 3. That Lewis negligently failed to warn the plaintiff of the danger incident to handling the oil-trap drain valve. 4. That such failure was a proximate cause of plaintiff's injury. 5. That the defendant failed to construct and install the oil-trap drain valve and the opening in a manner as free from danger to life, health, or safety as the nature of the plant would reasonably permit. 6. That such failure was a proximate cause of plaintiff's injury. 7. That no want of ordinary care on the part of the plaintiff proximately contributed to produce his injuries. 8. The damages were assessed at $23,500.

On motions after verdict, the trial court changed the answers of the jury to questions 1, 3, and 5 from "Yes" to "No," and the answer to the seventh question from "No" to "Yes," and granted judgment for the defendant on the verdict as so changed, and dismissed the plaintiff's complaint with costs. From the judgment so entered plaintiff has prosecuted this appeal.

For the appellant there were briefs by *Quarles, Spence & Quarles,* attorneys, and *Arthur B. Doe* and *Kenneth P.*

Graass v. Westerlin & Campbell Co. 194 Wis. 470.

*Grubb,* of counsel, all of Milwaukee, and oral argument by
*Mr. Grubb* and *Mr. Doe.*

For the respondent there was a brief by *Lines, Spooner &*
*Quarles* of Milwaukee and *Scott, Bancroft, Martin & Mac-*
*Leish* of Chicago, attorneys, and *Charles B. Quarles* and
*Lester L. Falk,* of counsel, both of Milwaukee, and oral
argument by *Mr. Charles B. Quarles* and *Mr. Falk.*

The following opinion was filed November 8, 1927:

DOERFLER, J.   As is evident from the assessment of dam-
ages by the jury, the injuries sustained were of a distress-
ingly serious nature, and defendant's counsel in his brief
does not assign as error the correctness of the assessment.
While the plaintiff grounds his action upon three distinct
causes of negligence, we will confine ourselves in this opinion
to the consideration of but one, which was submitted to the
jury in questions number 3 and 4 of the special verdict.
Question number 3 reads: "Did Lloyd Lewis negligently
fail to warn the plaintiff of the danger incident to the
handling of the oil-drain valve?"   Question number 4 reads:
"Was such failure to warn a proximate cause of plaintiff's
injury?"

The contract between the Union and the defendant, among
other things, required the defendant to instruct the proper
employees of the Union in the operation of this plant, of
which the oil-trap valve was a part.   Having assumed that
obligation, the duty devolved upon the defendant to so
instruct as to enable the employees operating the valve to
avoid such danger as was unknown to them, and which by
the exercise of ordinary care they could not readily anticipate.
Where the danger is open and notorious, and where the
mechanism is simple and the danger is obvious, or where the
employee by reason of his experience has knowledge of
the danger, ordinarily instructions are unnecessary; but
where it is complicated, so that it may not be readily under-

stood and is not understood by the employees, and a situation is presented where the employer either was cognizant of the danger or ought to have been cognizant thereof, proper instructions are required.

The evidence discloses that before the plant was operated in the strawberry room, the equipment was freed from ingredients which might produce a sediment in the oil trap, by the application of atmospheric pressure. There is a conflict in the evidence in this case tending to show that the apparatus in the room in which the injury occurred had not been freed of foreign substances as was done in the strawberry room, and the fact that a sediment in the oil trap appeared at the time of the accident is rather corroborative of plaintiff's claim that the atmospheric pressure to free the apparatus from foreign substances had not been applied. At least, this presented a question for the jury to determine.

It is also disclosed by the testimony of three of the defendant's experts, viz. Hammerslag, Lewis, and Mack, that small particles of scale and grit might be present in the apparatus and lodge in the oil trap, where they would sink to the bottom, and that the valve would have to be opened considerably to allow them to escape; and that there might have been a slug of viscous matter that would come out with the oil, causing the oil and the viscous substance to spatter about the room, which would have a tendency to endanger the life, limb, and health of the employee operating the valve. It requires no argument to convince one that a pressure of from 140 to 175 pounds to the square inch, applied to the interior of the oil-trap tank, would have a tendency to force the oil, mixed with anhydrous ammonia, out through the opening of the valve with tremendous force if the valve were opened to a considerable degree; and it is equally clear, in view of the high pressure to which the interior of the tank was subjected, if a viscous substance forms at the mouth of the valve the oil will be forced out of the opening when the latter becomes sufficiently large to allow the plug and the oil to be expelled.

The valve was so situated as to require the operator to bend his body to enable him to reach it with his hand, and this would bring his face in rather close contact with the valve and also the pail located beneath the pipe through which it was designed that the oil would pass.

The plaintiff testified that Mr. Lewis, defendant's engineer, never gave him any written instructions with the exception of a certain placard which contained nothing concerning the valve. With reference to the drainage of oil, he was told that it had to be drained quite frequently, every day perhaps, and as he (Lewis) had done it; to put a pail under this trap, and to then crack the valve just a little bit. He was further told to open it just a little more, until the oil began to ooze out in a sort of ice-cream fashion, and the minute that oil stopped running, to quickly shut the valve. The instructions thus received, as testified to by the plaintiff, were the only ones given him by defendant's engineer, Lewis, and immediately preceding the accident the plaintiff proceeded to turn the valve in accordance with his instructions. He cracked the valve slightly, and no oil appeared. He continued this cracking carefully, and suddenly, and without perceiving any prior indication of danger, the oil was expelled through the opening with such force and violence that it rebounded from the pail and splashed over a large portion of the room, covering the plaintiff with oil mixed with this virulent poison known as anhydrous ammonia.

Assuming that the contract between the defendant and the Union did not require the former to instruct the plaintiff as to the proper operation of the valve, nevertheless it is certain that, inasmuch as Lewis assumed to instruct the plaintiff in this regard, he was under obligations to give him full, proper instructions as to the danger which might result under conditions like those herein existing, where a plug was formed at the mouth of the valve as the result of the viscous formation of the oil containing the foreign sediment. *Karsteadt v. Phillip Gross H. & S. Co.* 179 Wis. 110, 190 N. W. 844.

Lewis was a college graduate, and a mechanical engineer with many years of experience in the erection of refrigerator appliances.    Whether an accident of this kind had ever occurred in the operation of a valve like the one in question has no material bearing upon the liability of the defendant in this case.    Lewis knew of the tremendous pressure in the tank; he knew, or ought to have known, the virulent poison known as anhydrous ammonia.    He also knew that the oil would be liable to be heated to from 100 to 200 degrees Fahrenheit.    He and the defendant's experts knew that foreign substances like scales from the pipe, and from other sources, might settle to the bottom of the valve, and that it would create a viscous substance when mixed with the oil, which would act in the nature of a plug.    Not a single word of express warning was given to the plaintiff of the danger connected with the operation of the valve under circumstances like those which existed in the instant case.    Instead of informing the plaintiff of the deleterious effect which oil and anhydrous ammonia would have upon plaintiff's person if it came in contact therewith, he expressly deprecated such danger and told the plaintiff that such contact would not hurt him.

How, under the facts thus detailed, can it be consistently said that Lewis had complied with the duty devolving upon him under the contract and in law, to properly instruct the plaintiff and to warn him of the danger which lurked in the operation of this valve?    Moreover, how can it be said that under the evidence in this case rational men might not differ as to whether the proper instructions were or were not given? To say the least, the question presented a jury issue, and the jury having decided adversely to the defendant, its answer ought not to be disturbed.

No argument is necessary to persuade one that inasmuch as the jury found the defendant negligent in the respect indicated, the question of proximate cause was also one for the jury.

Graass v. Westerlin & Campbell Co. 194 Wis. 470.

We now come to the issue of contributory negligence, which was submitted to the jury and which was decided favorably to the plaintiff. The burden of proof upon this issue rests with the defendant. The plaintiff was a man thirty-eight years of age. He was a graduate of a high school. He was a man of rather more than ordinary intelligence. He knew something about liquid ammonia in its commercial form, but was not familiar with anhydrous ammonia. He had no knowledge of the baneful effects of this gas, heated as it was, and holding in suspension oil, when it comes in contact with the human body. He had been selected by the Union as an employee to assist in the installation of this refrigerator. All the knowledge he possessed of the operation of a refrigerator plant he derived from Lewis. He was not possessed with knowledge of the possible formation of a viscous mass at the mouth of the valve and the possible formation of a plug. After Lewis left the plant at Sturgeon Bay, plaintiff operated the oil valve as he was instructed on about ten different occasions, and at no time was there any evidence of the formation of a plug.

On one occasion while the plaintiff was present, Lewis attempted to drain the tank. He turned the valve, without effect. He turned it again, and continued to turn it until it was wide open, and no oil came. He then dismantled the valve, took off the pressure on the tank, and discovered that the valve was set upside down. From this it is argued by defendant's counsel that after plaintiff had given several turns to the valve he should have realized that there was something wrong, and that then he should have pursued the method employed by Lewis at the time when the valve was set in upside down. Here it must be remembered that there was no evidence in the case that the valve was ever thereafter improperly set; on the contrary, plaintiff had every reason to believe that the failure of the appearance of the oil was not due to that fact. He merely followed the implicit instructions which he had received, and in following such

instructions he sustained his injuries. Clearly the issue thus formed on the subject of contributory negligence was one for the jury.

Without treating the other grounds of negligence alleged in the complaint, we are satisfied that the judgment must be reversed. The case was ably and carefully tried. While the court committed error in several particulars, we are satisfied that upon the branch of the case herein considered there is no prejudicial error, and no useful purpose could be served in further extending this opinion.

*By the Court.*—The judgment of the lower court is reversed, and the cause is remanded with directions to enter judgment in plaintiff's favor for the amount found by the jury, with interest and costs.

A motion for a rehearing was denied, with $25 costs, on January 10, 1928.