Eleanor ACKERMAN, Appellant,

v.

YORK CORPORATION, Appellee.

Angeline LOESCH and Henry Loesch,
Appellants,

v.

YORK CORPORATION, Appellee.

Nos. 16012, 16013.

United States Court of Appeals
Eighth Circuit.

Oct. 17, 1958.

**2**

J. M. Daly, St. Paul, Minn., for appellants.

R. J. Leonard, St. Paul, Minn. (Eugene M. Warlich and Doherty, Rumble & Butler, St. Paul, Minn., were with him on the brief), for appellee.

Before SANBORN, WOODROUGH and VOGEL, Circuit Judges.

WOODROUGH, Circuit Judge.

Plaintiffs in these actions, Eleanor Ackerman and Angeline Loesch, were at work for the Litchfield Produce Company in the company's chicken picking room in its building at Litchfield, Minnesota, on October 20th, 1956, when explosions and fire occurred in the building and inflicted serious injuries upon them. These suits were for damages from alleged negligence. Henry Loesch, husband of Angeline, joined her as plaintiff in order to recover the damages he sustained on account of the injuries to her. Federal jurisdiction resulted from diversity and the amounts involved.

The explosions and fire came from ammonia escaping under pressure from the refrigeration system of the Litchfield Company located in the basement of its building in proximity to the heating plant from which the ammonia or fumes thereof apparently became ignited. The system supplied refrigeration to a flake ice making machine located on the second floor of the building with which Litchfield produced ice for use in processing chickens. It bought the ice machine and had it installed in the fall of 1953 pursuant to a written contract with Westerlin & Campbell Company. The contract, which was introduced in evidence, called only for the sale and installation of the new ice machine and Litchfield originally planned to have its own employees connect that machine to its refrigeration system. The statement in the contract was that the new ice machine would be supplied with refrigeration from Litchfield's "present ammonia compressor system" but after the ice machine was installed Litchfield employed Westerlin & Campbell to make the installation of the refrigeration system and connect it up to supply refrigeration to the ice machine.

For that purpose the Litchfield Company supplied Westerlin & Campbell with its own used refrigeration system parts including the compressor, condenser and receiver which Litchfield had on its property and Westerlin & Campbell made the installation in Litchfield's basement and connected the system up so that it supplied refrigeration for the new ice machine located on the second floor of the building.

The system so installed functioned satisfactorily for about three years and up to the time of the explosion on October 20, 1956. On that day Litchfield's maintenance man took two large pipe wrenches and was unscrewing a hose he had attached to the charging valve on the receiver. He broke a short half-inch pipe, referred to as a nipple, which connected two valves located on the receiver and which was carrying ammonia under pressure.

The half-inch pipe that broke was of single strength metal and according to undisputed evidence it should have been of double strength. However, the two ends of the half-inch pipe were screwed respectively into the two valves, permanently attached as a fixture on the receiver, so that there was no way to determine what the strength of the

metal was without taking the receiver assembly apart and exposing the pipe to inspection. The break permitted ammonia to escape and it became ignited, apparently from a spark in the heating plant, and exploded. The plaintiffs in the picking room on the second floor were badly burned.

Westerlin & Campbell was originally included as a party defendant in the actions but it was dismissed for failure to obtain jurisdiction over it. The plaintiffs' employer Litchfield was impleaded as a third party defendant but decision as to it was deferred and it is not a party to these appeals.

York Corporation was the manufacturer of the flake ice machine and was the first named defendant charged in the complaint with liability for plaintiffs' injuries on account of certain relations it had with Westerlin & Campbell. By amended complaint it was charged that York had assumed the obligations of Westerlin & Campbell and on the jury trial of the cases the court instructed the jury that " * * * if there is any liability on the part of Westerlin & Campbell by reason of the explosion which happened at the Litchfield plant on October 20, 1956, * * * such liability, if any, has been assumed by the York Corporation * * * ". The jury trial accordingly proceeded against York Corporation as sole defendant upon the claim of plaintiffs that said defendant was liable for the damages sued for because Westerlin & Campbell had committed the following acts of negligence and omissions in the construction of the refrigeration system causing the explosions and damage to plaintiffs, to-wit: (1) that it failed to provide and use a proper plan and design for its installation of the refrigeration system; (2) that it failed to properly instruct and warn the operators thereof; (3) that it failed to use pipe of proper thickness and; (4) that it failed to inspect the piping and valves connected to the receiver element of the system.

The evidence adduced for plaintiff on the trial that the half-inch pipe which broke was of single strength metal and should, in accord with sound practice of refrigeration engineers, have been of "double strength" metal was not controverted. It also appeared that when the used receiver element was supplied to Westerlin & Campbell by Litchfield to be put into the refrigeration system it already had attached to it as permanent fixtures the two valves, referred to as the "king valve" and the "charging valve". The king valve controls the flow of ammonia into and out of the receiver and it is attached to the receiver by a larger pipe that is welded into the receiver. The charging valve is connected to the king valve by the half-inch pipe that broke. The charging valve functions as the means of adding ammonia to the system from time to time as needed. The ammonia is contained in drums or tanks and in the ordinary course of procedure to add ammonia to the system a rubber hose is attached at one of its ends to the drum of ammonia and at the other end to the charging valve. Then the valve on the drum and the charging valve are opened and the king valve, which is a "T" valve, is closed on one side and ammonia flows from the drum through the charging valve and king valve into the refrigeration system. When the charging is completed, as shown by an attached guage, the valve on the ammonia drum and the charging valve are closed. The hose is removed. The king valve is then opened and the system is again in full operation. The system had been charged with ammonia many times since its installation by Westerlin & Campbell.

On the day before this accident a Mr. Heller, employed by Litchfield as maintenance man in charge of all of the refrigeration systems owned and operated by Litchfield at its plants in different cities, there being seven in all, charged the system here involved but he did not follow his usual course of procedure. After completing the charging he closed the valve on the drum of

**4**

ammonia and the charging valve and opened the king valve and removed the end of the hose that was attached to the drum so that the system was in full operation. He did not remove the other end of the hose from the charging valve. He left it attached to the charging valve until the next morning. Then he needed the hose for another purpose.

By that time the pressure in the system and within the half-inch pipe, or nipple, here involved was around 150 pounds, whereas, if Mr. Heller had followed customary practice on finishing the charging and had closed the charging valve, removed the hose and then reopened the king valve in that customary order, the pressure within the half-inch pipe would have been about 3.6 pounds. In order to get the charging hose off of the refrigeration system, Mr. Heller used a twelve inch and a fourteen inch pipe wrench; one with which he held the charging valve steady and with the other he pressed down on the hose. His testimony was that he applied very little pressure when the pipe broke and the ammonia in liquid form poured out. He was then unable to turn off the king valve but got out of the basement on account of the fumes. He turned off the main switch upstairs and, with help, succeeded in preventing the spread of the fire to the extent that operation was resumed the following Monday.

The position of the plaintiffs was that it was negligence on the part of Westerlin & Campbell proximately contributing to the accident to leave the half-inch pipe or nipple of standard instead of double strength metal in the refrigeration system when they assembled it. The half-inch pipe was only a few inches in length and at the time Litchfield turned over the receiver to Westerlin & Campbell the receiver had the valves attached to it as a permanent fixture and both of the ends of the pipe or nipple were threaded and screwed into the receiver valves. There was no dispute that it was impossible to see how thick the metal of the half-inch pipe was,

without taking the assembly apart. But plaintiffs adduced expert testimony to the effect that sound engineering practice called for the contractors to take the elements apart, when that was necessary in order to see the thickness of the pipe.

The defendant contended that when Litchfield supplied their own used elements for the construction of the refrigeration system, including particularly the receiver with the permanent fixtures attached, and required that they be used again in the refrigeration system for the same purposes they had always served, no duty evolved upon Westerlin & Campbell to take the fixtures apart to search for possible hidden and unsuspected defects. It was proved that Westerlin & Campbell made careful inspection of what was visible and saw that the elements had been used to perform the same functions for which they were wanted again. The parts presented no visible indication of defect or insufficiency. After the system was constructed Westerlin & Campbell made full and careful tests of it in operation and no defect was disclosed. Thereafter the system did function properly for three years. The receiver elements were apparently manufactured many years previously and nothing was shown to raise any doubt of the elements in question having functioned properly for many more than the three years after Westerlin & Campbell assembled them. Defendant's expert testimony was to the effect that sound engineering practices did not require Westerlin & Campbell to take the combinations apart to search for hidden defects under the circumstances shown and that they were not negligent in not doing so.

The court submitted the issue of negligence on the part of Westerlin & Campbell, contributing proximately to plaintiffs' injuries and for which the York Corporation would be liable, to the jury and the verdict was for defendant. A motion for new trial was denied in accord with the court's memorandum filed with the ruling which stated the reasons.

therefor and judgment of dismissal of the action with costs was entered. This appeal is to obtain reversal of the judgment.

Among the instructions given to the jury the court stated:

"If no duty, in light of the evidence, rested upon Westerlin & Campbell to take apart the charging valve in order to properly inspect the nipple thereon, then, of course, there can be no recovery herein, because no duty has been established or violated, and hence, no negligence has been established as to Westerlin & Campbell.

"It is not disputed that if the charging valve had been taken apart and the nipple examined, such examination would have disclosed it was made of single strength material, but whether any duty rested upon Westerlin & Campbell to make such examination in view of all the circumstances, is a question of fact that the Court must leave to the jury to determine."

The plaintiffs took no exception to that instruction. They do not contend on this appeal that the verdict did not conclusively settle against them that no duty rested upon Westerlin & Campbell to take the valves apart to inspect the concealed ends of the nipple screwed into the valves and that their failure to do so was not negligence.

Plaintiffs' contentions for reversal are in effect that; (1) the court erred in failing to instruct the jury that the installers had a duty to adopt a safe plan and design, and; (2) that they had a duty to warn and instruct Litchfield Produce Company and its maintenance man as to the dangers inherent in the use of the charging valve.

The district court was presented with the same contentions on the motion for new trial and answered them in the memorandum accompanying the denial of the motion. The court set forth the requested instructions of the plaintiff as follows:

" 'The jury is instructed that it is the duty of an independent contractor who negligently makes, rebuilds or installs a piece of equipment imminently dangerous in kind, such as the refrigeration equipment which we have under consideration in this lawsuit and which was admittedly installed by the defendant in Plant No. 1 of the Litchfield Produce Company, and who knows or should know that the foreseeable use is dangerous to human beings unless certain precautions be taken, and if the contractor realizes or should realize that the probable user will not recognize the danger, then the contractor is under the duty to warn the user of such danger and to advise the proper precautions to be taken by the user.

" 'It is the further duty of the contractor not only to warn of the specific danger but to make the warning sufficiently prominent so that the dangers will be called to the attention of the user.

" 'It is the further duty of the contractor to give accurate and adequate information and instructions pertaining to the use of the dangerous equipment and failure in this respect may constitute negligence.

" 'It is for the jury to decide whether or not the defendant provided a sufficiently adequate and prominent warning and instructions under the facts and circumstances in this case.' "

The court then observed:

"The short answer to plaintiffs' complaint of the failure of the court to charge as requested above is that the evidence did not establish any such duty on the part of defendant Westerlin & Campbell Company. The equipment, that is, the receiver, the condenser, and the compressor, was furnished by Litchfield Produce Company. Westerlin & Campbell Company had no knowledge that the equipment was unsafe, and noth-

ing appeared from a visual inspection thereof which would lead a reasonably prudent person to believe that the equipment was defective.

"Litchfield was not a concern inexperienced in the use of ammonia as a refrigerant. Its plant at Melrose, Minnesota, was equipped with refrigeration equipment comparable to the Litchfield plant. All that it requested of Westerlin & Campbell was that the latter should install the equipment furnished by it so that it would function in conjunction with the York Flake Ice machine. Litchfield did not look to Westerlin & Campbell for advice as to the safety of the equipment which it supplied.

"The Court submitted the case to the jury on the issue as to whether, in installing used equipment supplied by plaintiffs' employer, Westerlin & Campbell was required, in the exercise of reasonable care, to inspect the equipment by taking the equipment apart and examining the strength of the various conduits through which the ammonia passed in order to determine whether such piping was of sufficient strength to withstand the pressure to which such material is subjected from within and without. The jury answered that question by its verdict in the negative. The nipple in question was concealed, and the only manner in which its strength could be determined could be by taking apart the charging valve. A visual examination of the receiver from the outside, without taking the charging valve apart, would not disclose whether the nipple was of single or double strength. The installing foreman for Westerlin & Campbell stated that he assumed that the charging valve nipple was constructed of extra heavy metal. That assumption was made, not only by the Westerlin & Campbell men, but also by Heller, in charge of maintenance for Litchfield,

who was an experienced refrigeration maintenance man.

\* \* \* \* \* \*

"It would, indeed, be a singular doctrine if a contractor in installing used refrigeration equipment furnished by its employer was required to warn the employer, that there might be some defects in the equipment, in the absence of circumstances whereby any dangerous defects were known or readily forseeable by a reasonably prudent contractor. Restatement, Torts, § 404, Comment a, provides, in part,

" 'Indeed, chattels are often made by independent contractors from materials furnished by their employers. In such a case the contractor is not required to sit in judgment on the plans and specifications or the materials provided by his employer. The contractor is not subject to liability if the specified design or material turns out to be insufficient to make the chattel safe for use, unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe. The same is true in regard to materials furnished by the employer.'

"It must be remembered that Westerlin & Campbell did not make or supply this equipment. It did not rebuild it, nor did it repair it. Its duty was to install the equipment so that it would function with the new equipment which was furnished. There is a complete absence in the record of any circumstances which would justify the jury in finding that there was a duty to warn Litchfield of any possible defects in the equipment furnished by Litchfield, when Westerlin & Campbell not only was unaware of any defects therein, but also in the absence of any duty— as the jury found—to dismantle the equipment in order to determine whether the equipment was in any

way inadequate for the purposes for which it was to be used.

"Emphasis is placed upon the testimony of the witness Burch, who was employed by Westerlin & Campbell to install the equipment in question, in that some reference was made to the equipment by him as 'junk' when he observed it scattered on the premises in the Litchfield plant prior to installation. But, obviously, Burch's vernacular in this regard was typical in the trade by way of reference to any second-hand refrigeration units and in no way assumed to indicate that there were any obvious defects therein. And this analysis of his testimony is evidently sound in that the equipment functioned satisfactorily for some three years until an employee of Litchfield broke the nipple when he was attempting to remove a hose from the charging valve. Burch assumed that the nipple in question was of double strength. There were no circumstances to indicate the contrary. Burch's admission that he had seen nipples in charging valves made of single strength in no way related to the equipment in question. There were no circumstances here which would cause him or any reasonably prudent person to assume that Litchfield had purchased inferior equipment.

"Reference is made by plaintiffs to Murphy v. Barlow Realty Company, [206 Minn. 527,] 289 N.W. 563. But that case is clearly distinguishable. Defendant here did not knowingly build, construct or manufacture a dangerous apparatus. It merely installed and set up refrigeration equipment which was furnished by Litchfield. It did not 'make, rebuild or repair a chattel for another * * * knowing that his work has made it dangerous for the use for which it is turned over' as that language is used in the Restatement of Torts, § 403, nor did it 'supply a chattel' as the language is used in

Restatement of Torts, § 388. And the case of Graass v. Westerlin & Campbell Company, 216 N.W. 161, 194 Wis. 470, has no bearing upon the issue here. There exists in this record no basis for the instruction requested by the plaintiffs."

Our own examination of the record confirms in all respects these conclusions of Judge Nordbye. We find nothing in the record to support the contention that there was a duty on the part of the installers of the system to explain to their employer or their employer's employees the steps they had taken to make the installation of the refrigeration system. It was obvious that the parts Litchfield supplied had been put to the use intended and that they functioned under tests as they were intended to function. The nipple in question never failed to function properly, either during the three years after 1953 when the system was installed at Litchfield's plant or during any of the more than twenty years that it was in use before that. In fact it never failed through any operation of the system. Mr. Heller broke it with the heavy pipe wrenches.

At the conclusion of the instructions to the jury when exceptions were called for, plaintiffs' counsel stated that it was plaintiffs' contention that the installers should have warned that they had not torn down the equipment on the receiver that was furnished them or made an inspection of the thickness of the pipe. But the installers had no knowledge or reason to suspect that there was any defect in the parts supplied to them by their employer and it is settled by the jury verdict that it was not their duty to take them apart to find out. They did their full duty when they inspected the visible parts, subjected the system to tests in operation and honestly and expertly concluded that the system was safe and sound in all respects.

As to warning Litchfield of possible dangers in operating the system, it does not appear that the installers knew any more about the operation of

the system than the Litchfield Company which operated no less than seven refrigeration systems in its various plants. We find no error in the statement of Judge Nordbye that Litchfield did not look to Westerlin & Campbell for advice as to the safety of the equipment with which it supplied them.

Litchfield's maintenance man had supervision of all its refrigeration plants for many years and was thoroughly experienced in their composition and operation. He had charged the various systems, including the one in issue, with ammonia many times. He was fully competent to and would have taken charge and installed the refrigeration plant himself if other necessary work had not prevented it. As to his knowledge concerning the risk he took in using the pipe wrenches with which he broke the nipple, he answered the question:

"Q. Also isn't it true that you knew you could break it [the nipple on the charging valve] very easily if you * * * weren't very careful? A. Yes."

In taking exception to the instructions given to the jury counsel for plaintiffs did not call the attention of the court to any specific claim that Westerlin & Campbell was negligent in failing to devise a support for the charging valve and attaching it to the receiver. Nor was attention directed to such a claim by any request for specific instructions. It is however contended on this appeal that the court erred in not submitting such an issue to the jury. We do not agree.

The attachment of the charging valve to the receiver was at all times and for many years the same permanent fixture as when Litchfield turned it over to Westerlin & Campbell to be put into service. It had always served its purpose and continued to do so for the three years prior to the accident. There was no evidence that the employment of the installers required them to devise or incorporate such an addition to the system or that their failure to do so contributed to the accident or constituted actionable negligence. There was no

ground to infer that Litchfield's employee did not understand the working of the system or the operation of the valves, or the difference in pressures resulting from different operation of the valves. He knew the possibility of breaking the half-inch pipe with the pipe wrenches and that more ammonia would escape if it was under 150 pounds of pressure than under 3.6 pounds.

■ Appellants have cited and relied particularly on Graass v. Westerlin & Campbell Co., 194 Wis. 470, 216 N.W. 161; Murphy v. Barlow Realty Co., 206 Minn. 527, 289 N.W. 563; Hartmon v. National Heater Co., 240 Minn. 264, 60 N.W.2d 804; and Lovejoy v. Minneapolis-Moline Power Implement Co., 248 Minn. 319, 79 N.W.2d 688, which we have considered. But we think Minnesota law applicable to the case was not mistakenly applied by Judge Nordbye. Fundamentally, when the jury verdict in these cases established that the installers of the refrigeration system were not negligent in incorporating the receiver element with its attachments, as they received it from their employer, the plaintiffs were left without any just cause of complaint under applicable Minnesota law against the sole defendant York Corporation. As stated in Boyd v. City of Duluth, 126 Minn. 33, 36, 147 N.W. 710, 711 and quoted in Lynghaug v. Payte, 1956, 247 Minn. 186, 76 N.W.2d 660, 666, 56 A.L.R.2d 1090:

"'* * * No principle is better established than that acts or omissions by one person followed by injury to another do not alone give rise to liability. If the conduct complained of be not willful, it must constitute negligence, and the legal concept of the latter is composite and correlative, involving not only conduct with respect to some subject-matter but also a duty to the person injured, or some class to which he belongs, of which the conduct constitutes a violation; and such duty, furthermore, when not specifically defined, is not to guard against all possible consequences of

the conduct, but only against those which may reasonably be anticipated.' "

We conclude that the cases were fairly and properly submitted to the jury and that the judgments based on the verdicts are without error.

Affirmed.