LINCOLN FIRE FIGHTERS ASSOCIATION, LOCAL 644, APPELLEE, V. CITY OF LINCOLN, NEBRASKA, APPELLANT.

252 N. W. 2d 607

Filed April 6, 1977. No. 40798.

Charles Humble, Dana Roper, Nelson, Harding, Marchetti, Leonard & Tate, and William A. Harding, for appellant.

Bauer, Galter & Geier, for appellee.

Earl D. Ahlschwede, for amicus curiae.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, MC-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

City of Lincoln appeals from an order of the Court of Industrial Relations increasing wages of Lincoln firemen and ordering the city to refund amounts withheld under a pay lag system. We affirm in part and reverse in part.

Lincoln Fire Fighters Association, Local 644, brought this action in the Court of Industrial Relations pursuant to section 48-811, R. R. S. 1943, alleging that its employment contract with the city of Lincoln had expired on September 1, 1975, and that the parties had failed to negotiate a new contract. A pretrial conference narrowed the issues to wages, longevity, clothing allowance, insurance, fire equipment operator pay, and prevailing rights in the contract.

By an order entered on April 5, 1976, the Court of Industrial Relations increased minimum wages by 12.3 percent and maximum wages by 8.6 percent, with intermediate wages increased by an amount equal to the average of the two figures. The court further ordered the city to refund money that had been withheld from pay checks in connection with the establishment of a pay lag system. No order

was made on any of the fringe benefits since the court determined insufficient evidence had been presented on those issues. We first discuss the pay lag portion of the order.

The city instituted the pay lag system for all city employees, effective September 1, 1975. Under this system the 2-week pay period begins on a Thursday. Pay checks are issued on the second Friday following the completion of the pay period. The net result is that the payroll department has 7 working days to prepare the pay checks. Rather than delaying pay checks for 7 work days, in order to convert to this new accounting system, the city withheld .7 of each city employee's biweekly pay checks, spread over eight pay periods. This money was placed in a pay lag fund to be paid out upon termination of employment. The employee receives no interest on the money placed in the fund.

All city employees except the firefighters received a 10 percent pay increase, beginning September 1, 1975. Because the firefighters had not renegotiated their contract, they were still paid the rate stipulated in the old contract less .7 for the pay lag fund for the 8 weeks. Even though this money would eventually be paid, each firefighter experienced a wage reduction of an amount equal to .7 of a biweekly pay check for eight pay periods.

We agree with the Court of Industrial Relations. The establishment of the pay lag is a change in wages, and cannot be established unilaterally during the term of an operative contract. We affirm that portion of the order which directs the city to pay the amount of the pay lag which was withheld from wages accruing under the existing contract.

The issue in this case was not whether the city could initiate a new accounting system referred to as a pay lag. The firefighters concede this may be done. It is the operation of the pay lag to the contract then in existence to which they object. Insofar

as the order of the Court of Industrial Relations may be construed to disapprove of the adoption of a pay lag system as to future contracts, it is reversed.

The Union presented evidence which compared the Lincoln, Grand Island, and Omaha fire departments with respect to both wages and fringe benefits. The city offered wage comparisons from four different groupings of eight cities. The court rejected the evidence offered by the Union as not being comparable. It concluded, however, that one of the comparisons presented by the city was appropriate for determining prevalent wages and working conditions.

The court selected the West North Central Array by city population for purposes of comparison. These cities, with the estimated 1975 population, are: Des Moines (194,000), Cedar Rapids (109,900), and Davenport (100,300), Iowa; Wichita (264,000), Topeka (126,580), and Kansas City (169,000), Kansas; St. Paul (291,000), Minnesota; and Springfield (128,000), Missouri. Lincoln's population estimate is 158,500. The city's expert testified these cities were chosen on the basis of geographical location and population. Four of the cities have a greater population than Lincoln, and four have a lesser population. In selecting this particular array of cities over the other three presented by the city, the court also considered similarity of working conditions, including such factors as the size of firefighting forces, population density, and climatic conditions.

The minimum rate of pay for Lincoln firefighters was shown to be 9 percent below the arithmetic mean of the minimum rate in the eight cities, as of September 1975. The maximum rate of pay was 5.3 percent below the arithmetic mean. The court ordered the wages for the Lincoln firefighters increased by these amounts.

The court also found that contracts in five of the

eight cities had January 1 for a starting date, and that Cedar Rapids and Omaha (which was not one of the cities in the array) showed an increase of 5 percent for calendar year 1976. Based on this fact, the court determined that an average increase of 5 percent could be expected for 1976.

It then determined that because the contract involved commenced on September 1, 1975, only 8 months would be subject to this 5 percent increase. Thus, the court ordered an additional increase of two-thirds of 5 percent, or 3.3 percent. In effect, the minimum wage was ordered increased by 12.3 percent, and the maximum wage by 8.6 percent with intermediate wages increased by an average of these two figures.

The city maintains the court should not have ordered a wage increase after rejecting the evidence presented by the Union. This contention is without merit. It is true the burden is on the moving party in a section 48-818, R. R. S. 1943, case, to demonstrate that existing wages are not comparable to the prevalent wage rate, but all evidence contained in the record may be considered for this purpose. There is no merit to the city's contention that the city's evidence cannot be used. The burden of proof is satisfied by actual proof of the facts, of which proof is necessary, regardless of which party introduces the evidence. 31A C. J. S., Evidence, § 104, p. 176.

In Omaha Assn. of Firefighters v. City of Omaha, 194 Neb. 436, 231 N. W. 2d 710 (1975), we held that prevalent wage rates for firemen must of necessity be determined by comparison with wages paid for comparable services in reasonably similar labor markets. In section 48-818, R. R. S. 1943, in selecting cities in reasonably similar labor markets, for the purposes of comparison in arriving at comparable and prevalent wage rates, the question was whether as a matter of fact the cities selected for

comparison are sufficiently similar and have enough like characteristics to make comparisons appropriate.

We conclude there was sufficient evidence for the court to find that wages received by Lincoln firefighters were not comparable to prevalent wage rates. In selecting the fire departments to be used for comparison, the court considered the size and complexity of the firefighting forces and the physical conditions under which the firefighters work is done. Among those factors considered were geographical proximity to Lincoln and similarities in population, population density, force size, and weather conditions. The method of selection employed was in accord with the requirements of section 48-818, R. R. S. 1943.

However, the method of comparison used by the court did not comply with the statutory requirements. The evidence in this case showed the eight cities selected for comparison had on the average more than twice as much manufacturing as Lincoln, and presumably more unionization. There was also evidence that the median income in the cities selected was generally higher than the median income in Lincoln. Because the evidence established the cities selected were economically dissimilar to Lincoln, it was error for the court to utilize directly the mean wage rate of those cities in determining the prevalent wage rate.

In Omaha Assn. of Firefighters v. City of Omaha, 194 Neb. 436, 231 N. W. 2d 710 (1975), we stated: "A prevalent wage rate to be determined by the Court of Industrial Relations must almost invariably be determined after consideration of a combination of factors. * * * It must be noted also that in this case the Court of Industrial Relations did not determine the prevalent wage rates for firemen by any direct computation or application of average or mean rates from seven cities nor from ten cities. Instead, it

weighed, compared, and adjusted all the factors involved in each of the cities which resulted in a determination of prevalent wages paid for comparable services in reasonably similar labor markets.''

We hold that in determining prevalent wage rates for comparable services in reasonably similar labor markets, the Court of Industrial Relations is required to weigh, compare, and adjust for any economic dissimilarities shown to exist which have a bearing on prevalent wage rates.

In Omaha Assn. of Firefighters v. City of Omaha, *supra,* we further stated: ''In establishing wage rates under section 48-818, R. R. S. 1943, the Court of Industrial Relations is required to take into consideration the overall compensation received by the employees, including all fringe benefits.'' This was not done in this case as no evidence was presented on fringe benefits received by the firemen in those cities used for comparison.

The Court of Industrial Relations was further in error in adjusting wages upward by 3.3 percent to compensate for anticipated increases in 1976. The only evidence presented on this point was that contracts in five of the eight cities were subject to renewal in January 1976, and that in two cities, Cedar Rapids and Omaha, wages were to be increased by 5 percent. Omaha, however, was not one of the cities included in the comparison, and further, the court had specifically rejected it as not being comparable. It is evident this figure was arrived at by speculation, surmise, or conjecture. An issue depending entirely upon speculation, surmise, or conjecture is never sufficient to sustain a judgment, and one so based must be set aside. Mitchell v. Eyre, 190 Neb. 182, 206 N. W. 2d 839 (1973).

We affirm the judgment of the Court of Industrial Relations insofar as it directs the payment of the pay lag withheld from the wages of the firefighters. We reverse the judgment in all other particulars,

and remand the cause to the Court of Industrial Relations with directions to make a determination of the prevalent rate of pay based upon a consideration of overall compensation received during the relevant period. We further direct that in its application to Lincoln, the court make an appropriate adjustment for economic variables as described heretofore.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

McCOWN, J., concurring.

The opinion of the Court of Industrial Relations does not make separate findings of fact and conclusions of law. It does contain, however, the only record of the findings of fact and conclusions of law made by the Court of Industrial Relations. That record necessarily forms the basis for any appellate review. The opinion establishes that the wage rates for Lincoln were determined by making a direct mathematical computation of the mean (average) minimum and maximum wage rates for firefighters in the eight cities used in the array as of September 11, 1975. The only adjustment made to that mathematical average was a percentage increase based upon the estimated or anticipated percentages of increase which might be granted in the eight cities of the array in succeeding contracts. This adjustment was made to adjust the mathematical average of September 11, 1975, to a contract year of August 1, 1975, to July 31, 1976.

The record also shows that the mean population of the eight cities used in the array was 48.5 percent larger than Lincoln, and the median population of those cities was 36.5 percent larger than the population of Lincoln. The opinion specifically states that the Court of Industrial Relations was not comparing cities, populations, and amenities, but was comparing work done in fire departments in the eight locations.

It would be unusual indeed if any eight cities could be found which would be sufficiently comparable that an appropriate prevalent wage rate to be applied in a ninth city could be properly determined by simply making an arithmetical computation. Certainly it is appropriate for the Court of Industrial Relations to consider mean and median figures. Its determination of the prevalent wage rate to be applied in the case before it, however, needs to be made after weighing, comparing, and adjusting all comparable relevant factors in the cities making up the array. For purposes of appellate review the record presented in this court must support the determination of the Court of Industrial Relations. The record here does not support the determination.

BOSLAUGH, J., joins in this concurrence.

CLINTON, J., concurring in part, and dissenting in part.

The majority opinion acknowledges that the evidence "was sufficient for the court to find that wages received by Lincoln firefighters were not comparable to prevalent wage rates" and expressly approves the selection of cities used in making comparison to determine the "prevalent wage." It goes on, however, to hold that the Court of Industrial Relations erred in its determination of the wage rate increase to which Lincoln firefighters were entitled, because the "court did not comply with statutory requirements." In so saying, this court relies upon our opinion in Omaha Assn. of Firefighters v. City of Omaha, 194 Neb. 436, 231 N. W. 2d 710. I am unable, however, to determine from the opinion with what "statutory requirements" the Court of Industrial Relations did not comply. An even more serious matter perhaps is the fact that the majority opinion offers no concrete guidance as to how the Court of Industrial Relations should go about making its wage determinations in this case on the remand. The majority opinion says: ". . . it was error for the court

to utilize directly the mean wage rate of those cities in determining the prevalent wage rate."

Section 48-818, R. R. S. 1943, prescribes the statutory standard. In Orleans Education Assn. v. School Dist. of Orleans, 193 Neb. 675, 229 N. W. 2d 172, we held that the statutory standard was constitutionally adequate. The statute says that the Court of Industrial Relations "shall establish rates of pay and conditions of employment which are comparable to the *prevalent wage rates paid and conditions of employment maintained for the same or similar work of workers exhibiting like or similar skills under the same or similar working conditions."* (Emphasis supplied.) It also requires that overall compensation and benefits be considered. It seems apparent to me that as applied to this case the statute requires comparison of the wages of firefighters, not a comparison of the income of persons in all other parts of the economy. Yet if one looks behind the words of the majority opinion to the record upon which it is based, that appears to be what this court would require.

The statement that the "comparison . . . did not comply with the statutory requirements" is, in my judgment, incorrect and apparently arises from three things, to wit, (1) a misunderstanding of what was being compared in Omaha Assn. of Firefighters v. City of Omaha, *supra;* (2) a failure to apply the provisions of section 48-818, R. R. S. 1943, which establishes the appropriate standard; and (3) perhaps a misunderstanding of the evidence in the case before us.

In Omaha Assn. of Firefighters v. City of Omaha, *supra,* the Court of Industrial Relations and we on appeal compared firemen's wages with firemen's wages, and everything that was said in that case was premised upon that fact. In the case now before us the majority opinion would require not a comparison of firemen's wages with firemen's

wages under comparable conditions, but holds as a matter of law that such comparison must be adjusted by a factor which compares income of other than firemen in Lincoln with income of other than firemen in the comparable cities. We will demonstrate this in a little more detail later.

The findings of the Court of Industrial Relations in this case was founded upon the City's evidence, not that presented by the Union. The Court of Industrial Relations simply did not buy the theory of the City's economist that after the comparison is made there must be a further adjusting factor arrived at by comparing nonfiremen's income in Lincoln with nonfiremen's income in other cities.

All this is contained in a relatively small portion of the bill of exceptions: Exhibit 27, pages 5 and 6, and pages 138, 139, 140, 141, 142, and 143 of the testimony of Dr. Sherman. Columns one and two (not numbered) of page 6 of exhibit 27 compares firemen's wages with firemen's wages in the various comparable cities and shows that a 9 percent increase in Lincoln firemen's minimum pay is needed for Lincoln firemen to reach the mean or average minimum wage of that in the other cities and that a 5.3 percent increase is needed to reach the maximum (or top of the pay scale) in Lincoln to reach the mean maximum in the comparable cities. This is the figure the Court of Industrial Relations used, disregarding for the moment the 3.3 percent additional increase which the Court of Industrial Relations added because of possible pay increases in other cities occurring after the date. This clearly conforms with the statutory standard for it compares firemen's salaries with firemen's salaries.

The remaining four columns (unnumbered) of page 6 of exhibit 27 compares nonfiremen's income with nonfiremen's income. This is explained on page 139 of the testimony where Dr. Sherman says: ". . . you have to make everything relative. So,

therefore, a wage should be relative to the *income in the prevailing city.*" (Emphasis supplied.) The witness is here comparing nonfiremen's income, including that of bank presidents, businessmen, professionals such as doctors and lawyers, salesmen, factory workers, government workers including judges, capitalists, and all other segments of society. Of course the statute requires no such thing, but by this means the witness arrives at required increases of 4.4 percent and 1.1 percent. See the appropriate line on columns 3 and 4. How ludicrous this is is highlighted by the fact that it is apparently undisputed that Lincoln offered a 10 percent increase to firefighters. I would suggest that doctors, lawyers, bank presidents, judges, etc., form no part of the market from which the firefighters come.

As already noted, the majority opinion relies upon Omaha Assn. of Firefighters v. City of Omaha, *supra,* and quotes that case as follows: " 'A prevalent wage rate to be determined by the Court of Industrial Relations must almost invariably be determined after consideration of a combination of factors. * * * It must be noted also that in this case the Court of Industrial Relations did not determine the prevalent wage rates for firemen by any direct computation or application of average or mean rates from seven cities, nor from ten cities. Instead, it weighed, compared, and adjusted all the factors involved in each of the cities which resulted in a determination of prevalent wages paid for comparable services in reasonably similar labor markets.' " As I read the Omaha case we were there speaking of the statutory standard, i.e., that as applied to that case firefighters' wages in similar labor markets.

A comparison of the opinion of the Court of Industrial Relations in the case now before us and its opinion in the Omaha firefighters case shows that in each that body did essentially the same thing.

In the Omaha case the seventh syllabus of the

Court of Industrial Relations opinion was as follows: "Section 48-818 does not fix any single formula or combination of formulas whereby the prevalent wage rate is to be determined. Rather the Court must make the pragmatic adjustments which may be called for by particular circumstances." In the Omaha case we approved what the Court of Industrial Relations did and its opinion was before us for review. An examination of that opinion shows that the Court of Industrial Relations was establishing a "hypothetical market," because no actual comparable market existed. In that case the Court of Industrial Relations had before it the testimony and statistics provided by two economists, one Kilgallon for the firefighters, and one Connell for the City of Omaha. In the case before us, just as it did in the Omaha case, the Court of Industrial Relations did not accept in their entirety theories and evidence of either side. Kilgallon's premises were in part rejected because his figures were bottomed solely on similarity of economic conditions. The Court of Industrial Relations said: ". . . it is clear that his testimony is bottomed on the premise that economic circumstances in the communities compared are irrelevant to wage determinations under Section 48-818. He, therefore, makes no effort to demonstrate any comparability of the communities he utilized with Omaha, other than his demonstration of comparability of firefighting circumstances." Connell testified that some adjustment for economic circumstances is required. The Court of Industrial Relations pointed out that there were weaknesses in Connell's testimony also, but said: "The problem raised by Connell's testimony is one which we have not previously been required to face. The great bulk of our 48-818 determinations have involved public school teachers in the State of Nebraska. None of these cases have required us to depart from Nebraska information in order to make a determina-

tion. The relative homogeneity of the Nebraska economy has largely prevented the type of variables which concern Connell from influencing our teacher pay cases. In addition, we have imposed certain control on the evidence we utilize, which prevent factors other than value of service from influencing our determination. Thus, in the teacher pay cases, we have either utilized the athletic conference to which the school district belongs, . . . or, where an appropriate athletic conference was not available, we have required the information upon which we base our wage determination to come from school districts in close geographic proximity to the litigating district and of comparable size to the litigating district, . . . . [T]his case poses for the first time the question of what controls we will impose upon data submitted in 48-818 cases in which information from the State of Nebraska is either not available or severely limited. . . . What the statute does not tell us is where we are to find 'the prevalent wage rates.' . . . We believe that the appropriate standards for selection are implicit in the statutory scheme.

"In an unregulated labor market, labor and management test their relative market power through bargaining. This testing may include resort to the strike or the lockout. However, the Legislature decided that the services provided by employees subject to our jurisdiction were too vital to allow interruption while employer and employees tested the merits of their claims by trial by battle. When discussion is barren, employers and employees in the public sector are routed here. Judicial mandate replaces economic power as the determinate of wages.

"However, the Legislature in providing for a judicial determination of wages did not deprive either management or labor of its market power. Rather, *it commanded that we so set wages and conditions of*

*employment that employers are required to pay the market price of labor. In other words, we are to set wages at the level on which the parties ultimately would have settled if they were free to exert the range of leverage available in an unregulated labor market.*

"The 'prevalent' then is to be found in the market where the employer before the Court hires labor and in which the employees before the court offer their services. However, in many instances, and this case is one of them, the only employer of a particular service in a relevant market area is the employer before the court. Because of the statutory limitation on the employees' right to strike, the wages paid by such an employer cannot be treated as determinative of the prevalent free market wage rate. *In such a situation, we must structure a hypothetical market in order to determine wages.*" (Emphasis supplied.)

The court went on to discuss the testimony of the expert witnesses for each side and to point out that the evidence did not show that firemen's salaries in the cities in the array varied in direct proportion to the amount of manufacture and unionization and that in fact in some instances the opposite was true.

The court then said: "We have already noted that Connell utilized state by state figures in his critique of Kilgallon's evidence. However, Kilgallon's evidence involves a comparison of cities. *The evidence in this case demonstrates that the presence of higher levels of unionization or higher wages in one state than in another do not directly lead to higher wages for firemen in cities in the higher state over those paid firemen in cities in the lower state. Connell's testimony indicates that both levels of unionization and wage rates are higher in Ohio than in Minnesota. However, as Table 2 of plaintiff's Exhibit 2 demonstrates, wages paid to firemen in Minneapolis*

*and Saint Paul are higher than those paid to firemen in any of the four arrayed Ohio cities.*

"*Connell's testimony demonstrates that a direct determination of wages for Omaha firemen cannot be made from plaintiff's Exhibit 2, Table 2. Nevertheless, his testimony does not destroy the central point made by that exhibit.* Even making due allowance for the variables of unionization and presence of manufacture, nevertheless, Exhibit 2, Table 2, demonstrates that Omaha firemen are entitled to a substantial wage increase." (Emphasis supplied.)

The Court of Industrial Relations then pointed out that: "While the Union may have presented us an array which is skewed upward, the City's array is skewed downward from the appropriate level. . . . *The evidence presented by the parties gives us a range within which we may act.* Clearly, the evidence presented by the City sets a bottom line. The City's proposed 8.2% wage increase is too low. Even accepting the City's theory that a differential with Lincoln should be maintained, at least 9% would be justified. On the other hand, the 12% requested by the Union is too high. It finds its base in an array of cities where wages should be higher than Omaha's because of economic circumstances not present in Omaha. Thus, somewhere between 9% and 12% lies an appropriate figure at which to find the prevalent. . . . In the teacher pay cases, *we have traditionally used the mid-point of arrayed data as the basis of decision. . . .*" (Emphasis supplied.)

The Court of Industrial Relations then went on to compare the salaries of firefighters in the various cities in the array and determined the Omaha firefighters' percentage of wage increase in the following language: "The differential which we believe to be justified lies in the range from 9% to 12%. The mid-point of this range is 10.5%. If we utilize the

City's 8.2% figure as the bottom line, the mid-point of the range from 8.2% to 12% is still 10.1%. We, therefore, believe that a wage increase of 10.2% over existing Omaha wages represents a conservative judgment as to a wage level comparable to the prevalent.''

It is thus demonstrated that the Court of Industrial Relations in the Omaha case did not use any factoring method such as appears in exhibit 27, pages 5 and 6, and the results of which are shown in the columns on page 6 under the heading "To Lincoln Minimum Maximum." Yet that is apparently what the proposed opinion would require in the case before us.

In this case the Court of Industrial Relations did not so elaborately discuss the evidence, but it is clear that it was applying the same standards as it did in the Omaha case. Beginning on page 28 of the transcript, the Court of Industrial Relations' opinion is in part as follows: "The second issue for the Court to determine is the appropriate universe to consider in determining prevalent wages and working conditions. As the Court said in Verdigre Education Association v. The School District of Verdigre, at 111-4:

'' '* * * The purpose of groupings (e.g. conference, locality, size) is basically to find a representative sample of manageable size within which comparable work, skills and working conditions exist. * * *'

"Before determining what the appropriate groupings are, the Court rejects the Plaintiff's contention that the grouping be limited to Grand Island, Lincoln, and Omaha for several reasons.

"First, there is no testimony that there is any similarity in working conditions between the firemen in all three cities. In fact, the testimony is quite the opposite. Second, this Court in both Grand Island Firefighters v. City of Grand Island and Omaha Firefighters v. City of Omaha essentially rejected

the comparability of Lincoln to either of the other cities; and third, and most important, the pay scales of each of the cities have already been set by this Court for Grand Island for 1976 and for Omaha for 1975. *The essential standard set in 48-818 relates to prevalent wages for similar work. The underpinning of this concept is the market.* If this Court looks to its own decisions as to what are the prevalent wages instead of market, its findings will become essentially circular and the standard will become simply what this Court thinks is fair, as such a standard was never contemplated in 48-818. The standard of pay in the act is what other employees similarly situated as to work and skills received. *The Court can receive evidence on this point and apply this evidence to this standard.*

"The Court also rejects the contention of the Plaintiff's that the cost of living is relevant. The fact that the cost of living has either gone up or down does not in any way affect what the firefighters should receive. There is no guarantee that a standard requiring that firefighters receive the prevalent wages for similar work insures that such workers maintain a particular standard of living. In fact, the law is just the opposite. If the market rate for such work being considered increases faster than the cost of living, then the workers are entitled to the market rate; the reciprocal, of course, is just as true.

"This Court recognizes that in labor negotiations that cost of living considerations are always present and probably more so in public employment than in the private sector. However, cost of living considerations will reflect themselves in wage determinations made in contracts of firefighters in the other cities and thus be indirectly considered." (Emphasis supplied.)

The court then went on to discuss similarity of working conditions and then said: "Turning then to

the salaries on Page 6, the pay raise necessary for Lincoln to reach mean (average) of minimum salaries of the array is 9% and the pay raise necessary to reach the mean (average) of the maximum salaries of the array is 5.3%."

Thus I think it is demonstrated that the Court of Industrial Relations applied essentially the same methods and standards in the case now before us that it did in the Omaha firefighters case. It determined the market price for similar labor under similar conditions. I do not see how we can say that the statutory standard contained in section 48-818, R. R. S. 1943, requires that the factoring method advocated by Lincoln's witness in this case must be applied. In both these cases the Court of Industrial Relations simply made a judgment based on a similar hypothetical market and on working conditions and arrived at a prevalent wage. This is all that the statute requires.

It is important to observe that: (a) The Court of Industrial Relations exercises a legislative function and we have said so in no uncertain terms. See Orleans Education Assn. v. School Dist. of Orleans, *supra,* pages 682, 685, and that despite what the statute says about review de novo in this court we cannot constitutionally review de novo legislative functions. Scott v. State ex rel. Board of Nursing, 196 Neb. 681, 244 N. W. 2d 683.

In any event, de novo review does not mean that we may disregard the provisions of section 48-818, R. R. S. 1943. That statute provides the principle which is applicable to wage determinations. It requires comparison of teachers' wages with teachers' wages, firefighters' wages with firefighters' wages, etc. We can determine only whether the Court of Industrial Relations applied the proper standard and whether there was evidence to support that it did.

I am at a complete loss to understand the significance of the concurring opinion of McCown, J. If

that opinion means that firefighters' wages are to be fixed directly in the proportion that the population of Lincoln bears to the population of the other cities in the array, then again such a principle finds no support in the statutory standard. One need not be an economist to know and the evidence here demonstrates that firefighters' salaries are not scaled in direct proportion to the population of the cities.

I would affirm the order of the Court of Industrial Relations insofar as the basic wage rate increase is concerned. In other respects I concur in the majority opinion.