ROBERT MOON, APPELLANT, v. WINGER BOSS COMPANY, INC., AND IOWA BEEF PROCESSORS, INC., APPELLEES.

287 N. W. 2d 430

Filed January 15, 1980. No. 42408.

Yaneff & Cosgrove, O'Brien & Galvin, and Mohummed Sadden, for appellant.

William Kunze and Maurice Redmond, for appellees.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

Plaintiff, an employee of defendant, Iowa Beef Processors, Inc. (IBP), filed this action against defendant, Winger Boss Company, Inc. (WB), for injuries sustained when he fell during the course of his employment and became entangled in certain machinery manufactured for IBP by WB. The case was submitted to a jury on issues of strict liability in tort and negligence, and resulted in a verdict in

favor of WB. Plaintiff has appealed, assigning as errors certain of the trial court's instructions defining a manufacturer's duties, the plaintiff's duties, including contributory negligence and assumption of risk, and issue preclusion. We affirm.

On July 12, 1974, plaintiff was working on a cleanup crew in IBP's meatpacking plant, using a high-pressure hot water hose. While descending a stile over a conveyor he tripped and fell and somehow his arm became entangled in the sprocket, chain, and framework located at the takeup end of a moving conveyor-type breaking table.

The production line of IBP consisted of a series of conveyors and conveyor-type tables called breaking tables. It was the latter type of table into which plaintiff fell. The particular table, BT-9, was approximately 70 feet long and 36 inches high. It consisted of supporting framework and a work surface composed of a series of metal slats attached to a pair of endless chains. At the power end, the chains were propelled by a sprocket wheel and chain attached to an electric motor. The takeup end consisted of a pair of large sprocket wheels slightly less than 36 inches in diameter around which the entire slatted table surface revolved. The appearance was not unlike that of the end portion of the drive tread of a huge crawler-type tractor. There was no safety shield or guard protecting the "pinch points" made by the chain moving onto the sprocket wheel, and it was possible for someone to stick an arm or leg into this area. Screen guards were placed here after the accident.

John Travlos, an engineer for WB, was called as a witness by plaintiff. He explained how his company was involved in the design and manufacture of packinghouse equipment. According to him, his company had manufactured and installed similar conveyor tables for other meatpackers before 1969. He readily conceded that the end of a breaker table,

where the conveyor chain meshes with the takeup sprocket, is a danger point where a piece of clothing or an arm or a hand could become caught. He also agreed that WB did not provide or recommend any shield guard at the takeup end of any of the tables. IBP had specified all the components to be used in the manufacture of the breaking tables, and, as a matter of fact, the takeup sprocket wheels in use at the time of the accident were different from those furnished by WB.

Further amplifying his testimony when called as a witness for the defendant, Mr. Travlos related how his company was invited to bid on the manufacture of the component parts for the various breaking tables, based upon a set of specifications furnished by IBP. After the bid was made, and during a conference in January of 1969 with IBP officials, the specifications were changed at the latter's request. Basically, the original specifications called for a Sandvick belt type of operation which is a continuous stainless steel belt riding on a vulcanized belt. The belt is moved along by a sprocket wheel which, instead of having teeth on its outer perimeter, has a groove in which the belt rides. The change to the metal slats attached to a chain, existing at the time of the accident, was requested by IBP. The contract was awarded to WB and the parts manufactured accordingly. WB was not requested to assist IBP in the design of any of the equipment. It manufactured the steel frame for the conveyor, the adjustable shoes for the conveyor, the chain and flights, the sprockets, shafts, cutting boards, motors, and reducers which were shipped loose to be assembled by IBP upon arrival in the plant. During the manufacturing process, WB had requested a detailed plant layout for the section of IBP's packing plant where the various breaking tables were to be assembled and installed, but this request was refused on the ground that the system that was being

employed was to be a very secretive way to process meat. WB was also denied entrance to the IBP plant. The specifications provided for chain guards for the power end, which were furnished. There is no evidence that the specifications required Winger Boss to furnish chain guards on the conveyor take-ups.

Ray Durflinger testified that he was the design engineer hired by IBP to design and develop a ma-terial-handling system to automate the processing of boxed beef. He prepared the specifications upon which WB made its bid. The breaking tables, in-cluding BT-9, were component parts of that system. He stated that his design did not contemplate a chain guard at the takeup end of the conveyor be-cause "it is not normally guarded there." He also said it is difficult to guard something when other equipment is placed next to it and that the takeup end is "normally guarded after the equipment is in-stalled and related equipment installed then you guard where necessary." He said IBP had this re-sponsibility.

Donald Wandling, a mechanical engineer, testified for the defendant. Generally, his testimony was to the effect that it would be impossible to satisfac-torily guard equipment of the nature involved here until the complete system was installed. The reason for this opinion was that it would be necessary to know what other equipment would be placed in the immediate vicinity, where other conveyors are to pass by, where work spaces are to be located, and the presence of walkovers, pillars, walls, and auxili-ary equipment. He also felt that no one could design a system of guarding unless he had a knowledge of the completed system.

Leo Peters, a professional mechanical engineer, testified on behalf of the plaintiff. He pointed out the reasons why moving chain drives, belts, con-veyors, and cog wheels having "nip points" can be

dangerous. He also opined that it would not be practicable to isolate machinery used in a packing plant when it is designed so that people have to be working around or near it, and that the only feasible safety precaution is to employ shields or guards around the hazardous parts. Finally, he gave as his opinion that a takeup end as was involved in this case, in the absence of some kind of a guard, would be "unreasonably dangerous." He also felt that, in his opinion, reasonable engineering standards were not exercised in the production of a breaking table with an unguarded takeup end, nor was a reasonable degree of care, skill, and diligence exercised. He also called attention to the shield or guard over the takeup end of the table that was shown in a photograph taken in 1975. He said it would have been feasible to manufacture and install such shields in 1969 for about $100 per table end.

Plaintiff's claim both as to strict liability and negligence is founded on improper design. There is no evidence to support a finding of improper manufacture. A defect in the design of a product can form the basis of a claim in either strict liability or common law negligence. Hancock v. Paccar, Inc., 204 Neb. 468, 283 N. W. 2d 25 (1979). However, we have never before considered the situation in which a manufacturer follows completely the design of the employer without the opportunity for final inspection. Restatement, Torts 2d, § 404, p. 364, states: "One who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels." However, reading on into Comment a. to that section, it states in part as follows: "Indeed, chattels are often made by independent contractors from materials furnished by their employers. In such a case, the contractor is not required to sit in judgment on the plans and specifications or the materials provided

by his employer. The contractor is not subject to liability if the specified design or material turns out to be insufficient to make the chattel safe for use, *unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe."* (Emphasis supplied.)

Spangler v. Kranco, Inc., 481 F. 2d 373 (4th Cir., 1973), involved an injury to the plaintiff, an employee of a subcontractor of Reynolds Metals Company, occurring during construction of a plant for the latter. Plaintiff was struck by a pendant overhead crane being operated by an employee of Reynolds. The crane had been manufactured by defendant according to plans and specifications furnished by Reynolds. The crane was not equipped with any bells or warning devices nor did the specifications call for the same. In sustaining a judgment which had directed a verdict for the defendant, the court said: "We find additional support for the action of the district judge in the principle that the products liability rule holding a manufacturer liable does not apply where the product has been manufactured in accordance with the plans and specifications of the purchaser except when such plans are so obviously dangerous that they should not reasonably be followed. Littlehale v. E. I. du Pont, etc. & Co., 268 F. Supp. 791, 802 n. 16, (S.D.N.Y. 1966), aff'd 380 F. 2d 274 (2 Cir. 1967); Davis v. Henderlong Lumber Co., 221 F. Supp. 129 (N.D.Ind. 1963). Cf. Greater Richmond, etc., Inc. v. A. H. Ewings Sons, Inc., 200 Va. 593, 106 S. E. 2d 595."

In Littlehale v. E. I. du Pont de Nemours & Co., 268 F. Supp. 791 (1966), aff'd 380 F. 2d 274, the court awarded summary judgment in favor of the defendant manufacturer of blasting caps, suggesting by way of an extensive footnote that a manufacturing contractor complying with strict contract requirements and specifications is relieved of liability un-

less such plans are so glaringly or patently insufficient that an ordinary prudent manufacturer would not follow them.

In granting a summary judgment in favor of the defendant manufacturer, the court, in Davis v. Henderlong Lumber Company, 221 F. Supp. 129 (1963), stated in part: "Thus, it was stated in Russell v. Arthur Whitcomb, Inc., 100 N. H. 171, 121 A. 2d 781 (1956), that one important limitation on the rule placing building contractors on the same footing as sellers of goods, * * * is that *the contractor is not liable if he has merely carried out the plans, specifications, and directions given him, since in that case the responsibility is assumed by the employer, at least when the plans are not so obviously dangerous that no reasonable man would follow them.* (Emphasis supplied by court).

"Insofar as Travis v. Rochester Bridge, 188 Ind. 79, 122 N. E. 1 (1919), is consistent with this rule, it is the law of Indiana, and the generally-accepted rule in other jurisdictions governing that question in the instant case."

Although somewhat distinguishable on the facts, the language in Taylor v. Paul O. Abbe, Inc., 516 F. 2d 145 (3rd Cir., 1975), is helpful here: "Also, while we must accept the jury's conclusion, based on expert testimony, that the mill was unreasonably dangerous, we do not believe that the absence of a gear guard was such a hazard that it was a near certainty that the machine, if operated at all without the guard, would result in serious injury." The judgment of the trial court was reversed with instructions to grant judgment notwithstanding the verdict in favor of the defendant.

Union Supply Co. v. Pust, 196 Colo. 162, 583 P. 2d 276 (1978), at first blush would seem to be on all fours with the instant case, but reaching a result opposite to that which we announce today. However, it was decided on facts suggesting that the manufac-

turer was the designer. "Based on this evidence, a jury could find Union Supply to be a designer of the conveyor * * *. If Union Supply is found by the trier of fact to be a designer and if the other elements of a s. 402A design defect case are established, then Union Supply will be strictly liable for Pust's injuries." The Colorado court rejected the court of appeals' view that a nondesigner manufacturer may be held strictly liable if it is feasible for him to install safety devices, but decided to follow what it calls the majority view holding such manufacturer liable for the injuries to a consumer caused by design defects in the component parts when they are expected to and do reach the consumer without substantial change in condition. We reject that view as it may apply to the specific facts in this case.

Barnthouse v. California Steel Buildings Co., 215 Cal. App. 2d 72, 29 Cal. Rptr. 835 (1963), was a case involving injuries to a small child who fell through the opening between the seat board and backrest of a grandstand, built by defendant in accordance with plans and specifications of the county of Madera. A jury verdict in favor of the plaintiff was reversed. The court said: "When the work has been performed in accordance with plans and specifications furnished by the owner which the contractor is bound to follow and the completed work has been accepted by the owner, the contractor is not liable to a third person for injuries resulting from a structural defect." The concurring opinion merely suggested that an exception should arise "* * * if a contractor builds a structure that constitutes an obvious danger to life or limb, or constitutes a hidden peril * * *" or the " '* * * plans and specifications * * * are so apparently defective that an ordinary builder of ordinary prudence would be put upon notice that the work was dangerous and likely to cause injury.' "

The better rule, it seems to us, and the one we adopt, is that a manufacturer is not liable for in-

juries to a user of a product which it has manufactured in accordance with plans and specifications of one other than the manufacturer, except when the plans are so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them. Here, WB manufactured every part in accordance with IBP's specifications. It furnished safety guards as prescribed. It was refused details of the proposed layout of the completed system. It was denied admittance to the IBP plant to observe the contemplated placement of the various component parts in relation to each other, personnel, or other structures. It was permitted no opportunity to inspect the assembled system once it was installed and made operational in order to determine the need for safety devices. As stated in Spangler v. Kranco, Inc., 481 F. 2d 373 (4th Cir., 1973): "There was no defect in the crane itself * * *. True, there was no bell or warning device but the reasonable need for such equipment depended upon the environment in which it was used by Reynolds * * *. Assuming that its use in the construction phase required a warning device, such a hazard was open and obvious to Reynolds and its personnel and the responsibility rested upon them not upon Kranco." There was no credible evidence supporting a finding that the plans as submitted were so obviously, patently, and glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them. To hold otherwise would be to engage in speculation and conjecture and to make the manufacturer an insurer as to everyone dealing with the machinery.

"An issue depending entirely upon speculation, surmise, or conjecture is never sufficient to sustain a judgment, and one so based must be set aside." Lincoln Fire Fighters Assn. v. City of Lincoln, 198 Neb. 174, 252 N. W. 2d 607 (1977). At the conclusion

of every jury case the court must decide, when properly raised, whether there is any evidence upon which a jury can properly proceed to find a verdict for the plaintiff. Empfield v. Ainsworth Irr. Dist., 204 Neb. 827, 286 N. W. 2d 94 (1979).

Winger Boss's motion for a directed verdict should have been sustained. While the trial court submitted the case to the jury, the verdict returned was for Winger Boss. As we determine on the record herein that the plaintiff did not carry his burden of proof, we would have been required to have set aside any other verdict than one for the defendant Winger Boss. In light of this conclusion, there is no need to discuss the errors assigned by the plaintiff. We therefore affirm the judgment for the defendant.

AFFIRMED.

KRIVOSHA, C. J., concurring.

I concur in the result reached by the court in this matter. Likewise, I concur in the rule announced by this court to the effect that a manufacturer is not liable for injuries to a user of a product which it has manufactured in accordance with plans and specifications of one other than the manufacturer, except when the plans are so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them. I disagree, however, with the majority when it concludes that the trial court should have directed a verdict in this case. In my view, there was sufficient evidence introduced to create a question of fact as to whether or not the manufacturer should have recognized the danger. I would have decided the instant case on the basis that whether the plans were so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them was a question of fact, and the jury having found in favor of the manufacturer and against the plaintiff, the judgment should be af-

firmed. See Shields v. County of Buffalo, 161 Neb. 34, 71 N. W. 2d 701; Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112; Hickman v. Parks Construction Co., 162 Neb. 461, 76 N. W. 2d 403.