# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2813

_____

Linda Thompson and     *
Roy Hedbert,     *
    *
      Plaintiffs-Appellants,     *
    *
      v.     *    Appeal from the United States
    *    District Court for the
Hirano Tecseed Company, Ltd.,     *    District of Minnesota.
    *
      Defendant-Appellee,     *
    *
      v.     *
    *
Sheldahl, Inc.,     *
    *
      Third-Party Defendant-Appellee.   *

_____

Submitted: March 13, 2006
Filed: August 1, 2006

_____

Before MURPHY, BOWMAN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Linda Thompson's arm was crushed as she cleaned an industrial laminator that Hirano Tecseed Company, Ltd. ("Hirano") manufactured for her employer, Sheldahl, Inc. Thompson and her spouse, Roy Hedbert, sued Hirano in Minnesota state court, alleging design-defect and failure-to-warn claims. Invoking diversity jurisdiction,

Hirano removed the case to federal court, brought a third-party claim against Sheldahl, and moved for summary judgment. The district court granted summary judgment, holding that Hirano did not design the laminator and had no duty to warn of its open and obvious dangers. Thompson appeals the dismissal of her design-defect claim. Having jurisdiction under 28 U.S.C. § 1291, this court reverses and remands.

I.

Sheldahl manufactures flexible electronic circuit boards, built from laminates. To make them, Sheldahl uses industrial laminating machines to adhere printed circuit boards to flexible substrates. In 1992, it decided to purchase a new laminator to increase production and advance technology. Sheldahl engineers created a general statement of work and submitted the project for bids. After reviewing the capabilities of numerous manufacturers, Sheldahl chose Hirano to manufacture the new laminator.

For two years, Sheldahl engineers developed comprehensive design specifications for the laminator, addressing adhesive requirements, tensions, speeds, temperatures, controls, and safety. The design plans specified the coating system, and directed Hirano to outfit the laminator with comma-coating.[1] Sheldahl specified the gap accuracy, materials, pump speed, tension, and side dams[2] for the comma coater. Sheldahl instructed Hirano to build manually-adjustable, partially-retractable side dams so that operators could easily adjust the coating controls when starting a new job. To meet health and safety regulations, Sheldahl also requested a coating-enclosure room to capture solvent vapors and control the cleanliness of the coating heads.

---

[1]"Comma coating" is a knife-over-roll system where adhesive is applied to the bottom of the laminate by a lip in the rollers.

[2]Side dams are reservoirs that pump adhesive into the comma coater as the laminate passes through the coating rollers.

As required by the manufacturing contract, Hirano created design drawings of the proposed laminator from Sheldahl's specifications, which Sheldahl had to accept or reject before manufacturing began. In the drawings, Hirano suggested that Sheldahl include interlocking doors on the coating-enclosure room, which would initiate an emergency stop and sound an alarm if an employee entered the room while the machine was operating. Hirano also recommended an emergency stop inside the coating-enclosure room to immediately shut down the machine if a problem arose during start-up or maintenance. Sheldahl rejected these features, because it wanted employees to enter the coating-enclosure room to control and adjust the laminator. Sheldahl hired a different company to design and manufacture the coating-enclosure room, without the recommended interlocks and emergency stops. That company also built an internal enclosure, complete with sliding doors and a stairway for access to the coating rollers. While Hirano played no part in fabricating these components, it did observe their installation and placement on the laminator.

Sheldahl approved Hirano's manufacture of the rest of the laminator, including the coating system. Hirano engineers then built the machine in Japan, shipped it, and assisted Sheldahl for three months with installation and training. Hirano engineers aligned the components of the machine, tested the computers, and made electrical and mechanical adjustments as it was installed. Hirano also assisted Sheldahl in running wet and dry trials to ensure that the machine met Sheldahl's needs.

During the wet trials, adhesive leaked from the side dams of the comma coater, dripping onto the laminate and rollers as the product traveled through the coating system. The lead Hirano engineer testified that the side dams leaked because they were not properly adjusted at the time. He showed Sheldahl employees how to manually adjust the adhesive levels on the side dams, and testified that the problem was fully corrected before Sheldahl finally approved the laminator. Despite Sheldahl's approval, numerous employees stated that the side dams have leaked since the laminator was installed.

Because the side dams leak, Sheldahl operators must watch the laminate as it passes through the comma coater to ensure that the adhesive does not drip and smear the final product. If the adhesive leaks, operators enter the coating-enclosure room to clean the rollers via the stairway and retractable doors on the side of the room. Sheldahl instructs operators to wipe excess adhesive from the rollers with a rag or glove to ensure that no scrap product is created. Operators leave the machine running when cleaning the rollers, because the side dams leak most during start-up. While the lead Hirano engineer testified that he warned Sheldahl employees that this practice was dangerous, he admitted that he cleaned the running machine when training the employees how to adjust and operate the comma coater and side dams.

Thompson, an advanced operator and trainer, has operated the laminator since its 1994 installation. On June 11, 2001, she was feeding a copper laminate roll into the comma coater when adhesive leaked from the side dams, dripping onto the laminate. She could not determine where the adhesive dripped to, so she climbed the stairs and opened the doors to the coating-enclosure room to examine the rollers and clean the drip. After inspecting the rollers in the outer enclosure area, she opened the sliding doors to the internal enclosure room and saw the dripped adhesive on a roller underneath the coating assembly. As she reached through the doors to wipe up the drip, her hand caught between the moving roller and the laminate. The roller pulled her into the machine, crushing her hand and lower arm.

Thompson sued Hirano in state court for defective design and failure-to-warn, alleging that Hirano designed the laminator without adequate guards and warnings. Hirano removed the case to federal court, third-partied Sheldahl, and moved for summary judgment. Hirano argued that it did not design the laminator, but merely followed Sheldahl's specifications. Specifically, Hirano asserted that, in the design phase, it recommended the very safety features Thompson describes, but Sheldahl rejected them. Thompson identified two other design defects in her response to the summary judgment motion, citing depositions not previously available: first, that the

side dams to the comma coater are defective because they constantly leak adhesive; and second, that Hirano should have included hand guards on the rollers to prevent operators from reaching nip points.

The district court granted summary judgment to Hirano. Applying law from other jurisdictions, the court held that, because Hirano followed Sheldahl's specifications, it was not liable for a design that it did not produce. The court also found that the danger of touching moving rollers was open and obvious, preventing a failure-to-warn claim under Minnesota law. Thompson appeals only the design-defect ruling.

II.

This court reviews the grant of summary judgment de novo, applying the same standards as the district court. *See* **Price v. Xerox Corp.**, 445 F.3d 1054, 1056 (8th Cir. 2006). Summary judgment is affirmed if, viewing the evidence most favorably to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(c)**; **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 255 (1986). Summary judgment is not appropriate if the prima facie case is supported by specific facts sufficient to raise a genuine issue for trial. **A.T. Turner v. Gonzales**, 421 F.3d 688, 694 (8th Cir. 2005), *citing* **Hesse v. Avis Rent A Car Sys., Inc.**, 394 F.3d 624, 629 (8th Cir. 2005). This court accepts as true all facts presented to the district court by the non-moving party, if properly supported by the record. *See* **Beck v. Skon**, 253 F.3d 330, 332-33 (8th Cir. 2001), *quoting* **Tlamka v. Serrell**, 244 F.3d 628, 632 (8th Cir. 2001).

Minnesota law governs this diversity action. *See* **Erie R.R. v. Tompkins**, 304 U.S. 64, 78 (1938); **Mountain Pure, LLC v. Turner Holdings, LLC**, 439 F.3d 920, 923 (8th Cir. 2006). To establish a design defect, Thompson must present specific facts that (1) the laminator was in a defective condition unreasonably dangerous for

its intended use, (2) the defect existed when the laminator left Hirano's control, and (3) the defect proximately caused her injury. *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984), *citing* *Lee v. Crookston Coca-Cola Bottling Co.*, 188 N.W.2d 426, 432 (Minn. 1971). Minnesota merges negligence and strict liability claims into a single products liability theory, which employs a reasonable-care balancing test to determine whether a product is defective. *See* *Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. Ct. App. 1991) (court must balance "the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm"), *quoting* *Bilotta*, 346 N.W.2d at 621. *See also* *Young v. Pollock Eng'g Group, Inc.*, 428 F.3d 786, 788-89 (8th Cir. 2005) (applying Minnesota law). Whether a product is defective is generally a question of fact; only where reasonable minds cannot differ does the question become one of law. *See* *Drager v. Aluminum Indus. Corp.*, 495 N.W.2d 879, 882 (Minn. Ct. App. 1993).

On appeal, Thompson focuses only on the defective mechanical design of the side dams and comma coater, abandoning the other design-defect theories. *See* *Jasperson v. Purolator Courier Corp.*, 765 F.2d 736, 740-41 (8th Cir. 1985) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue"), *quoting* *Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 732 F.2d 903, 906 (Fed. Cir. 1984). She argues that, because the side dams have leaked since installation, the mechanical design of the finished comma coater is defective. She alleges that this is a design, not a manufacturing, defect.

As it did before the district court, Hirano responds that, even if the comma coater was defectively designed, Sheldahl – not Hirano – was the designer of the machine. Pointing to the manufacturing contract, it contends that Sheldahl created comprehensive specifications, with which Hirano fully complied in building the laminator's coating system.

Minnesota has not addressed whether a manufacturer is liable for a design defect if it follows a customer's specifications in manufacturing a finished product. The district court applied the general rule that, when a product is manufactured according to specifications, the manufacturer is not liable for design defects, unless the specifications are so obviously dangerous that they should not be followed. *See Austin v. Clark Equip. Co.*, 48 F.3d 833, 837 (4th Cir. 1995) (Virginia law); *Garrison v. Rohm & Haas Co.*, 492 F.2d 346, 351 (6th Cir. 1974) (Kentucky law); *Spangler v. Kranco*, *Inc.*, 481 F.2d 373, 375 (4th Cir. 1973) (Virginia law); *Lesnefsky v. Fischer & Porter Co.*, 527 F. Supp. 951, 953-55 (E.D. Pa. 1981) (Pennsylvania law); *Housand v. Bra-Con Indus., Inc.*, 751 F. Supp. 541, 544-45 (D. Md. 1990) (Maryland law); *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 376 A.2d 88, 90 (Del. 1977); *Luna v. Shockey Sheet Metal & Welding Co.*, 743 P.2d 61, 62 (Idaho 1987); *McCabe Powers Body Co. v. Sharp*, 594 S.W.2d 592, 595 (Ky. 1980); *Huff v. Ford Motor Co.*, 338 N.W.2d 387, 390 (Mich. Ct. App. 1983); *Fisher v. State Highway Comm'n of Mo.*, 948 S.W.2d 607, 612 (Mo. banc 1997); *Bloemer v. Art Welding Co.*, 884 S.W.2d 55, 59 (Mo. App. 1994); *Moon v. Winger Boss Co.*, 287 N.W.2d 430, 434 (Neb. 1980); *Houlihan v. Morrison Knudsen Corp.*, 2 A.D.3d 493, 494 (N.Y. App. Div. 2003). *Contra Hendricks v. Comerio Ercole*, 763 F. Supp. 505, 512-13 (D. Kan. 1991) (Kansas law) (majority rule does not apply to strict liability cases, only negligence actions); *Michalko v. Cooke Color & Chem. Corp.*, 451 A.2d 179, 183-84 (N.J. 1982) (same). This rule is consistent with the *Restatement (Second) of Torts § 404, comment a (1965)*:

> [T]he contractor is not required to sit in judgment on the plans and specifications or the materials provided by his employer. The contractor is not subject to liability if the specified design or material turns out to be insufficient to make the chattel safe for use, unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe.

The district court concluded that Minnesota would apply the general rule that absolves a non-designer that follows a customer's specifications. Like most jurisdictions, Minnesota assumes that product manufacturers are also designers. *See Bilotta*, 346 N.W.2d at 621 ("A manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable [foreseeable] risk of harm"), *quoting Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385-86 (N.Y. 1976). *See also McCormack v. Hankscraft Co.*, 154 N.W.2d 488, 497-98 (Minn. 1967); *Gross v. Running*, 403 N.W.2d 243, 246 (Minn. Ct. App. 1987). *Cf.* **Minn. Stat. § 544.41** (directing dismissal of defendants, other than manufacturers, who certify no role in the design or manufacture of a defective product). Moreover, Minnesota applies a reasonable-care standard to determine whether a manufacturer is responsible for selecting a defective design – a key consideration of the general rule. *Compare Bilotta*, 346 N.W.2d at 621, 624, *with Garrison*, 492 F.2d at 351, *and Castaldo*, 376 A.2d at 90. *Contra Michalko*, 451 A.2d at 183-84 (employing no-fault, strict liability principles).

Minnesota employs a similar rule in products liability cases where the defendant is hired to design and manufacture a component part for use in another's finished product. If the component-part manufacturer uses reasonable care to design the component to specification, it is not liable for defects in the finished product. *See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1056 (8th Cir. 1996) (applying Minnesota law) ("If . . . the finished product was unreasonably dangerous because the component part was unsuited for the particular use the finished product manufacturer chose to make of it, then the defect is in the design of the finished product rather than in the design of the component part"). *See also Ackerman v. York Corp.*, 260 F.2d 1, 6 (8th Cir. 1958) (upholding jury instruction on Minnesota law that employed an earlier version of the general rule from the Restatement (First) of Torts § 404(a) to relieve a non-designer of liability for design defects). Given these principles, this court agrees that Minnesota would apply

the general rule that a manufacturer is not liable for design defects when it builds a product in accordance with customer specifications.

Thompson does not challenge this legal conclusion, but argues that the district court decided contested issues of material fact in determining that Hirano was not a designer of the comma coater. She contends that Hirano did more than follow Sheldahl's specifications in building the laminator. Rather, Hirano helped develop and patent the comma coater more than 30 years ago, making the coating technology a specific Hirano design. As Hirano has designed and sold over 100 similar comma-coating laminators in the past 10 years, Thompson argues that the laminator is not unique to Sheldahl.

Thompson concedes that Sheldahl specified many requirements for the laminator's coating system. She points, however, to specific facts indicating that Sheldahl did not specify the mechanical design of the comma coater or side dams. Sheldahl did not describe the shape, size, base material, or adjustment mechanisms for these components, but relied on Hirano's expertise in creating the finished coating assembly. In fact, the contract between Hirano and Sheldahl specifies that Hirano is responsible for the "efficient completion of the system, including but not limited to the *design*, fabrication, assembly, delivery, field start-up, and acceptance testing." Moreover, the lead engineers from both Hirano and Sheldahl testified that the operating specifications for the laminator, including the comma coater and side dams, were jointly developed. As Thompson presents specific facts highlighting Hirano's design responsibility, she argues that the district court erred in dismissing her claims at summary judgment.

Hirano first responds that Thompson failed to specifically identify these facts in the district court, precluding this court from considering them. *See Shanklin v. Fitzgerald*, 397 F.3d 596, 601 (8th Cir. 2005). Hirano admits that Thompson included these facts in deposition transcripts attached to her summary judgment response. It

argues, however, that she did not designate specific facts establishing a genuine issue of material fact as to Hirano's design responsibility. *See* **Fed. R. Civ. P. 56(e)** (response to summary judgment must contain specific facts showing a material dispute for trial); *Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004) (opposing party must specify the evidence creating a disputed issue of material fact in attached deposition transcripts).

After carefully reviewing the record, this court concludes that Thompson presented adequate facts to the district court disputing whether Sheldahl alone designed the laminator. In addition to the attached deposition transcripts, her response, citing page numbers, directs the district court to specific facts in the record, and states the "constantly dripped adhesive" design defect as the main issue to deny summary judgment. This court finds that Thomson did sufficiently identify the material facts at issue in this appeal.

Viewing the evidence most favorably to Thompson, this court concludes that she has presented specific facts establishing a material dispute about Hirano's participation in the design of the comma coater and side dams. The district court relied solely on the existence of design specifications in holding that Hirano did not design the machine. Although Sheldahl created specifications, Thompson has presented specific facts indicating that Hirano did not only follow these specifications. The manufacturing contract specified that Hirano was to assist in designing the product; engineers from both companies testified that the operational specifications were jointly designed. From this record, a jury could determine that both Hirano and Sheldahl were designers of the defective comma coater. *See Union Supply Co. v. Pust*, 583 P.2d 276, 281 (Colo. 1978) (en banc) (evidence that two companies collaborated and substantially contributed to the final design precluded summary judgment against one on design-defect claim). Accordingly, this court holds that the district court erred in deciding contested factual issues regarding Hirano's role in

designing the comma coater and side dams. *See United States v. Taber Extrusions, LP*, 341 F.3d 843, 844 (8th Cir. 2003).

As an alternative basis to uphold summary judgment, Hirano asserts that, even if it designed the comma coater and side dams, Thompson failed to establish that a defect in them proximately caused her injuries. Specifically, Hirano contends that its recommendation to install interlocking doors and emergency stops on the coating-enclosure room would have prevented Thompson from accessing the rollers that injured her. Sheldahl rejected these design features, employing a different company to build the coating-enclosure room. Hirano argues that these alterations are the proximate cause of Thompson's injury. *See Rients v. Int'l Harvester Co.*, 346 N.W.2d 359, 362-63 (Minn. Ct. App. 1984) (relieving designer of liability where plaintiff substantially altered product after purchase).

Under Minnesota law, proximate cause is generally a separate factual issue to be resolved by a jury. *See McCormick v. Custom Pools, Inc.*, 376 N.W.2d 471, 475 (Minn. Ct. App. 1985) ("Issues of negligence and proximate cause are seldom matters capable of determination on a summary judgment motion"). Proximate cause exists if the defendant's conduct, without intervening or superseding events, was a substantial factor in creating the harm. *See Flom v. Flom*, 291 N.W.2d 914, 917 (Minn. 1980). In this case, Thompson claims that the comma coater is defectively designed because it leaks adhesive onto the rollers, necessitating cleaning. She concedes that another company designed the enclosure room without interlocks or emergency stops. She argues, however, that if the comma coater worked properly, she would never have entered that room to clean adhesive from the rollers – a substantial factor in her injury. She also presents evidence from which a jury could conclude that Hirano knew that the side dams leaked, that Sheldahl designed the enclosure room for employee access, and that employees cleaned the machine while it was running. Though Hirano contests each of these allegations, this court finds that Thompson has established genuine issues of material fact regarding the cause and foreseeability of her injury, precluding summary judgment on this issue. *See Westbrock*, 473 N.W.2d

at 360. *Compare Moon*, 287 N.W.2d at 434 (relieving manufacturer of liability where it had no opportunity to inspect the assembled product or observe the uses to which it would be put).

Finally, Hirano argues that the leaking in the comma coater is not a design defect. Rather, it asserts that Sheldahl failed to both maintain the laminator and operate it safely. While Hirano acknowledges that the side dams leaked during wet trials, the lead Hirano engineer testified that the side dams were adjusted and the problem fully corrected before he returned to Japan. Hirano argues that, if dripping continued, Sheldahl operators should have shut down the machine to adjust the side dams before cleaning the rollers.

Thompson rebuts this evidence with statements of numerous Sheldahl employees, who testified that the comma coater has leaked since installation. They further stated that, while the side dams are adjustable, no amount of adjustment or cleaning corrects the problem. Because the side dams leak most when the laminator is started, Sheldahl employees testified that it is inefficient to adjust the side dams when the machine is not running. Thompson also presented evidence that, during training, Hirano engineers used this same practice to wipe spilled adhesive from the moving rollers, signaling that the practice was safe. From this evidence, a jury could conclude that the comma coater was defectively designed, and that the defect existed when the laminator left Hirano's control. Accordingly, the district court erred in granting summary judgment. *See Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1112 (8th Cir. 1997).

III.

The judgment of the district court is reversed, and the case remanded.

_____

-12-