941 F.2d 1209
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Daniel L. HOVERMAN, Sr., Delores J. Hoverman, Plaintiffs-Appellants,
v.
HARNISCHFEGER CORPORATION, a foreign corporation, Defendant-Appellee.
 No. 90-1682.
 United States Court of Appeals, Sixth Circuit.
 Aug. 14, 1991.
 
 Before DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and ALDRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiffs, Daniel L. Hoverman, Sr., and Delores J. Hoverman, appeal this products liability case, contending that the district judge committed reversible error by submitting incorrect instructions to the jury.
 
 I.
 
 2
 Daniel Hoverman was injured while attempting to perform maintenance on an overhead, electrical crane manufactured by defendant, Harnischfeger Corporation. Plaintiffs alleged that the crane was unreasonably unfit for the purpose intended and defectively designed.
 
 
 3
 Defendant supplied the crane to the Central Foundry Division of General Motors Corporation in 1972. The crane consists of a magnet or hoisting device, a cab trolley, and a bridge, and is used in a scrap metal room to move metal from place to place. The bridge is a large steel beam which traverses the room in an east-west direction, and travels on rails located on the north and south sides of the room. The crane operator controls the crane from the cab trolley which sits on the bridge and travels along the length of the bridge and is thus limited to north-south movements. The combination of the bridge being able to move east and west, and the attached cab trolley being able to move north and south, gives the crane the ability to cover the entire room.
 
 
 4
 On the evening of September 25, 1986, the crane operator, James Milnes, noticed a thumping noise in the crane. Milnes contacted the millwright foreman, who sent two millwrights, Hoverman and Charles Quaderer, to troubleshoot the problem. Both of these men had over twenty years' experience as millwrights, and both had performed maintenance and repair on the crane on numerous occasions. They were also familiar with the aspects of maintenance and proper service procedures.
 
 
 5
 Proper procedure for troubleshooting problems with the crane dictated that the millwrights confer with the crane operator prior to commencing any diagnostic maintenance. However, both Milnes and Quaderer testified that no consultation took place among the three men prior to Hoverman being injured. Communication between the crane operator and maintenance people was important because troubleshooting this problem required Hoverman to step out onto the bridge to inspect the wheel housing portion of the bridge.
 
 
 6
 Under normal procedures, Hoverman and Quaderer would have gone up onto a catwalk which runs parallel to the rails upon which the bridge of the crane runs. Hoverman would then step onto the bridge, with Quaderer remaining on the catwalk facing the cab trolley and Hoverman, which would allow him to remain in contact with Hoverman and the crane operator. Inexplicably, the three men never communicated with one another prior to Hoverman getting on the bridge. Hoverman went up on the crane apparently without notifying either the crane operator or his assistant. Because the crane operator was unaware that Hoverman was inspecting the bridge wheel housing, he continued running standard production, and did not limit the movement of the crane to just moving the bridge. During the course of Hoverman's inspection, the operator moved the trolley along the length of the bridge, crushing Hoverman.
 
 
 7
 Plaintiffs' primary contention is that a lockout device,[1] coupled with warning signs, would have made the crane inspection safer, and that the lack of an exterior lockout and warnings made the crane unreasonably fit for its intended purpose. Defendant responds that there were lockout devices located in the main electrical control box which could, when used, isolate each motion of the crane, and that this lockout was the type which had been specified by General Motors for manufacture of the crane.
 
 
 8
 The district judge gave a standard jury instruction on negligence coupled with defendant's requested special instruction, but declined to give plaintiffs' requested instruction.
 
 II.
 
 9
 Plaintiffs maintain that the district court erred by giving defendant's special instruction, which reads as follows:
 
 
 10
 Defendant Harnischfeger will not be liable if you find that in manufacturing and designing the crane, it carefully and precisely carried out the plans, specifications and directions given to them by General Motors Corporation unless you also find that these plans, specifications and directions were so obviously defective and dangerous that no reasonable manufacturer should follow them.
 
 
 11
 The overall standard of review is governed by federal law:
 
 
 12
 Although state law controls the substantive content of jury instructions in diversity actions such as this, "federal law governs our standard of review for determining whether a jury instruction is prejudicial." Teal v. E.I. DuPont de Nemours & Company, 728 F.2d 799, 802 (6th Cir.1984). The "critical inquiry is whether the instructions as a whole provide the jury with sufficient guidance concerning the issues to be tried." Id. Even a charge that contains an "inaccurate or ambiguous statement does not constitute reversible error if the inaccuracy or ambiguity is unlikely to mislead the jury." Id.
 
 
 13
 Bagherzadeh v. Roeser, 825 F.2d 1000, 1003 (6th Cir.1987). The state law controlling the content of special jury instructions in Michigan can be found in Jones v. Porretta, 428 Mich. 132, 146, 405 N.W.2d 863 (1987):
 
 
 14
 In all events, like the Standard Jury Instructions, the giving of supplemental instructions are to be determined by the trial court "not in an abstract or theoretical sense, but in the context of the 'personality' of the particular case on trial, and with due regard for the adversaries' theories of the case and of counsel's legitimate desire to structure jury argument around anticipated jury instruction." (Citation omitted.)
 
 
 15
 The heart of plaintiffs' theory of recovery is that defendant failed to supply the crane with a lockout device which would have prevented the trolley from moving laterally, a theory similar to one relied upon by the plaintiff in Spangler v. Kranco, Inc., 481 F.2d 373 (4th Cir.1973). In Spangler, a plumbing subcontractor's employee was injured when struck by an overhead crane at a construction project. At the time the crane was manufactured and shipped by the defendant, it was not equipped with devices warning of the crane's motion, and neither the plans nor specifications of the buyer called for such devices. The court of appeals affirmed the district court's grant of a directed verdict for the defendant and observed that:
 
 
 16
 We find additional support for the action of the district judge in the principle that the products liability rule holding a manufacturer liable does not apply where the product has been manufactured in accordance with the plans and specifications of the purchaser except when such plans are so obviously dangerous that they should not reasonably be followed. While we do not suggest that the foregoing principle should be applied to immunize a manufacturer from liability in every case, we are of the opinion that [the defendant] acted reasonably in relying upon [the buyer's] industrial expertise and following its plans and specifications....
 
 
 17
 Spangler, 481 F.2d at 375 (citation omitted). Michigan courts have endorsed this view. See Huff v. Ford Motor Co., 127 Mich.App. 287, 338 N.W.2d 387 (1983); Clark v. Seagrave Fire Apparatus, Inc., 170 Mich.App. 147, 427 N.W.2d 913 (1988).
 
 
 18
 Although plaintiffs assert that General Motors had only minimal input in the design of the crane, one of defendant's exhibits contains eighty-five pages of specifications given by General Motors to defendant. These specifications cover structural design, electrical requirements, mechanical operation, and the type of lockout devices to be included in the crane. There was evidence that General Motors demanded that defendant comply with these specifications and was actively engaged in the design of the crane. Both the content of the specifications submitted to defendant and that evidence contradict plaintiffs' assertion that General Motors had little to do with the design of the crane. Since defendant presented evidence that it supplied the crane with a lockout devise specifically conforming to General Motors' specifications, the requested instruction conformed to the "personality" of the case, and the district judge was warranted in delivering it.
 
 
 19
 Plaintiffs' second assignment of error stems from the district court's refusal to submit to the jury their special instruction, which reads as follows:
 
 
 20
 In determining if the overhead crane was designed and manufactured with reasonable care at the time of its manufacture, you may take into account and consider the following factors as they existed at the time of design and manufacture: the relative cost of the crane; the cost and feasibility of eliminating or minimizing a given risk; the intrinisic nature of the crane; the gravity of potential harm from the crane defect; the likelihood of someone encountering the potential harm when utilizing the overhead crane; and the utility of the overhead crane.
 
 
 21
 This instruction does not conform to the "personality" of this case, in the sense that plaintiffs would have had the jury compare the costs and feasibility of alternative designs to the benefit that it would have provided to users of the product, when, under the circumstances of this case, such comparisons are inappropriate in view of the evidence that defendant designed the lockout device to General Motors' specifications.
 
 III.
 
 22
 For the reasons stated above, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Lockout devices allow electricians to disconnect a motor or piece of equipment in such a manner that electrical power is prevented from going to the equipment. Usually, lockout devices allow a lock to be affixed to the switch, thus making it impossible for power to be reconnected unless the lock is removed