RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

TERRY CASH-DARLING, as Personal Representative of
the Estate of Paul Cash, Decedent,

 *Plaintiff-Appellant*,

*v.*

RECYCLING EQUIPMENT, INC.,

 *Defendant-Appellee*.

┐
│
│
│
> No. 22-5346
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:19-cv-00034—Clifton Leland Corker, District Judge.

Argued: January 25, 2023

Decided and Filed: March 17, 2023

Before: GILMAN, McKEAGUE, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellant. Catherine A. Karczmarczyk, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Johnson City, Tennessee, for Appellee. **ON BRIEF:** Michael J. Wall, Janna Maples, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, John C. Duff, Marion M. Reilly, HILLIARD MARTINEZ GONZALES LLP, Corpus Christi, Texas, for Appellant. Catherine A. Karczmarczyk, Ronald S. Range, Jr., BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Johnson City, Tennessee, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  Paul Cash died when a hammermill shredder exploded at his workplace.  The Tennessee Occupational Safety and Health Administration (TOSHA) determined that the explosion was primarily caused by the accumulation of combustible aluminum dust produced by the shredding process.  Cash's sister, Terry Cash-Darling, brought this lawsuit as the personal representative of his estate against Recycling Equipment, Inc. (REI), the company that assembled and sold the shredder to Lighting Resources LLC (LR), Cash's employer.

The estate asserts four product-liability claims.  REI moved for summary judgment, arguing that because it "did not design the hammermill system at issue, and instead assisted LR with locating primarily used components that LR requested based on the design of LR's existing system, REI is not legally responsible for any alleged defect in the system as a whole."

The district court agreed and granted summary judgment in favor of REI, dismissing all of the estate's claims.  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this Opinion.

## I.  BACKGROUND

### A.    Factual background

LR is a recycling company that primarily processes lightbulbs and other lighting components.  In late 2016, however, the company began to recycle airbag modules and seatbelt pretensioners, both of which contain explosive charges.  LR purchased a used hammermill shredder for this purpose and equipped it with input and discharge conveyors to feed material into and out of the shredder, as well as a discharge bin to collect recyclable nonferrous metals that are magnetically separated from the ferrous metals.  An exhaust fan pulled smoke generated by the exploding charges out of the building where the shredder was housed.  LR processed

airbag modules and seatbelt pretensioners using this set-up for more than a year, after which LR decided to look into equipment that could process a greater volume of material.

Steve Barnett, an LR manager, contacted REI, a recycling-equipment company, about purchasing equipment that would meet LR's needs. According to Barnett, he described LR's existing system to Joey Walls, an REI manager, and explained how the system was being used. Barnett asked REI "if they could get me some equipment that was similar to what we had, but with a more durable, more heavy duty shredder, and one that was capable of processing a greater amount of material." He also told REI that he was concerned about the smoke created by the shredding process, and "that [REI] needed to get the smoke evacuated out" of the building. Beyond these basic requirements, Barnett did not provide any other specifications, drawings, or requirements to be used in the construction and assembly of the shredder system that LR desired.

REI had never sold a machine for shredding metal before. Most of its customers work with plastic and paper. Rather than build entirely new equipment, REI located a used 30-year-old hammermill shredder that it could resell to LR along with other new and used components necessary to complete the system. This included a used input conveyor, a new discharge conveyor built by REI, a used exhaust fan, and a new control panel built by REI. REI did not make any modifications to the used hammermill shredder unit before it sold the unit to LR as part of the larger assembly.

An REI employee, Ethan Eichelberger, prepared a series of five drawings of the shredder assembly that REI sold to LR. The drawings, which are each labeled "Proposal Drawing," include three elevation views from different angles and two overhead views. They are not highly detailed drawings, but they do include measurements of the various components and details about how they would be installed, such as the angle of the infeed and discharge conveyors along with the placement of the controls and mechanical components. The last drawing, an overhead view, includes a duct running from the exterior wall of the building to a circle labeled "new air filter." Boxes of text at the bottom of each drawing characterize the "design or details contained" in the drawings as "proprietary information," and request that the recipient "review the system design for its ability to function in your intended application." Another box, labeled "Safety Review," states:

> The need for safety devices varies with each application of this product. This drawing may not include all appropriate safety devices for your application. As systems integrator, please advise your customer of devices that are appropriate for his/her application, based on your safety assessment. . . . Compliance with federal, state, OSHA and local laws or codes are [sic] the responsibility of both you, as the systems integrator/distributor, and the end user.

In the above-quoted paragraph, "your" and "you" appear to refer to REI, and "the end user" appears to refer to LR.

The parties dispute the purpose of these drawings. According to both LR and REI, these were not design drawings; they were instead meant only to illustrate the dimensions of the system to ensure that LR could house the system in its facility. The estate disagrees. It contends that the drawings, which were the most detailed produced at any point in the process, show that REI substantially contributed to the design of the shredder assembly.

REI tested the machine at its own facility. Barnett, who observed the test, provided approximately 20 to 30 airbag detonators that the machine shredded. After the successful test, REI installed the shredder assembly at LR's facility. The final invoice listed a hammermill, an infeed conveyor, a discharge shaker, a discharge conveyor, a dust collector, and controls. The system, as it was installed by REI, also had a "baghouse type filter on the outside of the building," but did not include a dust collector, even though one was listed on the invoice.

Shortly after the shredder assembly was installed at LR's facility, its operation filled the room where it was housed with smoke. REI then installed an additional fan and ductwork, which cleared the building of smoke. Five days after the new fan was added, however, there was an explosion in the shredder. Barnett suspected that the explosion was caused by undetonated airbag charges accumulating in a "shelf-like" compartment inside the hammermill shredder. He sent REI a drawing demonstrating what he thought was the problem and proposed closing the compartment. REI made Barnett's proposed modification without conducting any of its own research or testing.

Approximately two weeks after REI completed the modifications to the hammermill shredder, it exploded again, this time killing Cash. TOSHA determined, after an investigation, that the primary cause of the explosion was combustible aluminum dust that had accumulated

inside the hammermill shredder because there was no "dust collection system in place." According to TOSHA's report, the lack of a dust-collection system violated several safety standards set by the National Fire Protection Association.

Although REI sold dust collectors as part of its regular business (typically for paper shredders), the record shows that REI and LR did not discuss dust collection in connection with the design of LR's shredder assembly; they discussed only smoke. There is some evidence in the record, however, that REI contemplated the need for a dust collector. Not only was a dust collector listed on REI's invoice, but Eichelberger forwarded to Walls an email that Eichelberger had received from an engineer with an air and vacuum company discussing performance metrics for a "tubular bag separator." Eichelberger commented on the email, saying: "Here is more information on the available bags for the dust separator for the Lighting Resources project. They couldn't tell me which of these filters would be the most useful with Nitrogen gas."

## B.     Procedural history

The operative second amended complaint asserts four product-liability claims: (1) negligent design, integration, marketing, and service of the shredder, (2) breach of the implied warranties of merchantability and fitness for a particular purpose, (3) strict liability for defects in the design of the shredder, and (4) strict liability for failure to warn of the dangers posed by the shredder.

REI subsequently filed a motion for summary judgment, arguing that is not liable because it did not design the shredder, but instead simply assisted LR in locating and installing used components. In opposition, the estate asserted that "REI substantially participated in the integration of the hammermill system, [and] that REI's integration caused the hammermill system to be defective and unreasonably dangerous."

The estate particularly relied on the "component-parts doctrine," which imposes liability on a manufacturer that "substantially participates in the integration of [a] non-defective component into the design of the final product, if the integration of the component causes the final product to be defective, and if the resulting defect causes the harm." *Davis v. Komatsu Am.*

*Indus. Corp.*, 42 S.W.3d 34, 42 (Tenn. 2001). The estate also argued that the cases cited by REI in support of its nondesigner argument are distinguishable.

In its decision granting summary judgment, the district court concluded that REI was not liable because it did not substantially contribute to the design or integration of the hammermill shredder. Although the court did not explicitly acknowledge that it was doing so, the court effectively held that Tennessee law recognizes the "contract-specification defense," which shields manufacturers from liability for "injuries to a user of a product which it has manufactured in accordance with plans and specifications of one other than the manufacturer, except when the plans are so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them." *Hatch v. Trail King Indus., Inc.*, 656 F.3d 59, 69 (1st Cir. 2011) (citing *Moon v. Winger Boss Co.*, 287 N.W.2d 430, 434 (Neb. 1980)); *see also* Restatement (Second) of Torts § 404 cmt. A (explaining the contract-specification defense in the context of negligence).

Judgment was entered in favor of REI. This timely appeal followed.

## II. ANALYSIS

### A.    Jurisdiction and applicable law

"Because subject matter jurisdiction in this case is based on diversity of citizenship, the substantive law of the forum state must be applied." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), and *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006)). "When the state's highest court has not spoken on the issue, the federal court is called upon to predict what that court would do if confronted with the question." *Id.* (citing *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012), and *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)). The parties agree that this case is controlled by Tennessee law.

### B.    Standard of review

Our review of the district court's determination of state law in a diversity case is de novo, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991), as is our review of its grant of summary

judgment. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 236 (6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When evaluating a summary judgment motion, the reviewing court must construe the facts in the light most favorable to the non-movant." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (citation omitted). Our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986)).

**C.    The estate has forfeited the argument that the contract-specification defense is inapplicable to claims arising under the Tennessee Products Liability Act**

The parties agree that the estate's claims are governed by the Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann. §§ 29-28-101 to 108. All product-liability claims are subsumed by the TPLA regardless of the substantive theory of recovery. *See* Tenn. Code Ann. § 29-28-102(6) (defining a "product liability action" to include "all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever.").

The estate first argues that the contract-specification defense is inapplicable to claims arising under the TPLA. Although the Tennessee Supreme Court has not resolved this issue, the estate has forfeited appellate review of this point.

"As a general rule in this Circuit, arguments raised for the first time on appeal are forfeited," including those not raised in response to dispositive motions. *See Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015) (citation omitted). The reason for this rule is set forth in *Sheet Metal Workers' Health and Welfare Fund of North Carolina v. Law Office of Michael A. DeMayo, LLP*:

> We adhere to this practice so that both the parties and this Court have the benefit of the district court's assessment of the issue when the case is taken up on appeal.

> We likewise do so out of respect for the district court, as it would surely seem unfair to that court for a party to ask us to assign error to the district court on an issue the party never presented to the district court in the first instance.

21 F.4th 350, 355 (6th Cir. 2021) (internal citation omitted). "To preserve the argument, . . . [a] litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

REI raised the contract-specification defense below, and the estate responded by arguing that the cases that REI relied on were distinguishable on their facts or procedural posture rather than by arguing that Tennessee law does not recognize the defense for TPLA claims at all. The question before the district court, therefore, was a factual one—did the facts support the application of the asserted defense—not the legal question that the estate now urges us to resolve. Because the estate did not argue below that Tennessee law does not recognize the contract-specification defense, the estate has forfeited the ability to do so on appeal.

We will therefore assume, as did the district court, that the defense is viable in Tennessee. This court, moreover, has previously applied the contract-specification defense under Kentucky law. *See Garrison v. Rohm & Haas Co.*, 492 F.2d 346, 351 (6th Cir. 1974) ("To hold [the manufacturer] liable for defective design would amount to holding a non-designer liable for design defect. Logic forbids any such result.").

**D.      The district court erred in holding that no genuine dispute of material fact exists as to whether REI followed LR's design specifications**

The estate argues that genuine disputes of material fact preclude summary judgment for REI on the contract-specification defense. We agree.

### 1.      *The record on appeal*

As an initial matter, REI argues that the estate "relies heavily on facts that neither party presented to the District Court, and that the District Court did not consider when granting summary judgment." REI therefore urges us to disregard the following two factual categories: (1) facts that the district court struck in its summary-judgment-related rulings, and (2) facts that

the estate did not present to the district court in opposition to REI's motion for summary judgement.

We may consider the first category of facts because the district court's striking order did not rule on the admissibility of any of the evidence that the estate submitted. Instead, the court struck these facts because it disagreed with how the estate characterized the record evidence and found that none of the proffered facts showed the existence of a genuine dispute for trial. This means that the court effectively considered the stricken facts even though the court said that it would not do so.

Because the district court's striking order amounts to its interpretation of the evidence, de novo review calls for us to do the same. "[I]n reviewing summary judgment, we look at [the] record in the same fashion as the district court," *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007) (second alteration in original) (quoting *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992)), "viewing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party," *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 416 (6th Cir. 2022) (quoting *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 843 (6th Cir. 2019)).

Left then is what to do with the fact that the estate's appellate briefing cites several pieces of evidence that, although embedded in the summary-judgment record, were not specifically referenced by either party in their district-court briefing. That answer is simple: we cannot consider facts that neither party marshalled in support of or in opposition to the summary-judgment proceeding below. *See Bormuth v. Jackson County*, 870 F.3d 494, 499–500 (6th Cir. 2017) (en banc) (holding that the court will not consider facts that were not referenced in opposition to a motion for summary judgment even if they were in the record). Because "[w]e must review the case presented to the district court[] instead of a better case fashioned after a district court's unfavorable order," *Swanigan v. FCA US LLC*, 938 F.3d 779, 788 (6th Cir. 2019) (quoting *Estate of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 925 (6th Cir. 2013)), we confine ourselves to the facts actually presented to the district court.

We are troubled by the estate's appellate briefing given its lack of transparency, which caused REI and the court to expend considerable resources reviewing and addressing unnecessary record issues, and we expect such professionally unacceptable conduct not to be repeated. Despite our concerns, we conclude that the facts properly before the district court raise a genuine dispute as to the viability of REI's contract-specification defense.

### 2. *REI is not entitled to summary judgment on the contract-specification defense*

A key requirement of the contract-specification defense is that the customer provide the manufacturer with detailed plans or specifications directing how the product should be built. *See, e.g.*, *Thompson v. Hirano Tecseed Co*., 456 F.3d 805, 811 (8th Cir. 2006) (denying summary judgment on the contract-specification defense where the customer "did not specify the mechanical design" of the product and did not "describe the shape, size, base material, or adjustment mechanisms" of the product's components, instead relying on the manufacturer to "create[e] the finished . . . assembly").

Manufacturers who are able to satisfy the requirements of the contract-specification defense have typically received detailed plans or specifications directing exactly how the product must be built. *See, e.g.*, *Hoverman v. Harnischfeger Corp*., 941 F.2d 1209 (6th Cir. 1991) (unpublished table decision) (holding that the contract-specification defense applied when "eighty-five pages of specifications [were] given by General Motors to defendant" detailing how to manufacture the product); *Rardon v. Holland, LP*, 279 F. Supp. 3d 93, 99 (D.D.C. 2017) (granting summary judgment on the contract-specification defense when a transit company gave "extremely detailed contract specifications . . . to build a machine . . . . Significantly, the evidence shows that [the customer] maintained control over the design of the [product] such that [the manufacturer was] required [to seek] permission to make any changes.").

By contrast, in cases like the one before us, where there was collaboration between the customer and the manufacturer, the defense is generally not available. *See, e.g.*, *Union Supply Co. v. Pust,* 583 P.2d 276, 281 (Colo. 1978) (en banc) (holding that evidence that two companies collaborated and substantially contributed to the final design precluded summary judgment on a design-defect claim); *Nygaard v. United Parcel Serv. Gen. Servs. Co*., 1 F. Supp. 2d 1173, 1183

(D. Or. 1998) ("[T]he court concludes that a jury could find that Toppan Moore and Inforite participated too much during the design phase . . . for the contract specifications defense to apply.").

The district court's opinion below emphasizes that Barnett "asked REI to purchase the system's components based on LR's existing system," and that he "relayed to REI the need for an exhaust system to remove 'visible smoke created by processing air bag modules.'" This evidence, according to the district court, meant that "Barnett, and not REI, designed the shredder assembly, and controlled what safety features would or would not be included at the LR facility." But this reading of the record fails to draw all reasonable inferences in favor of the estate as the nonmoving party.

The testimony and documentary evidence in the summary-judgment record does not foreclose the possibility that REI made design determinations in the way that the shredder system was assembled. To what extent Barnett directed the details of the shredder assembly is ambiguous. At a minimum, he left REI to identify the components and the precise way in which they would be assembled. LR, after all, did not submit any written specifications for the construction of the shredder system, and the only drawings produced were made by REI, not LR. Given the same parameters that Barnett gave to REI, a different manufacturer might well have sold LR a shredder assembly with a different configuration or different features.

The district court also found that "[i]t is undisputed that Barnett . . . took responsibility for the safety of [the shredder assembly's] operation." But the safety disclaimers printed on each of the drawings prepared by REI contradict the court's conclusion that Barnett took sole responsibility for assessing safety.

Nor does the record support the district court's conclusion that "LR . . . chose not to include a dust collection device with the hammermill shredder assembly, and this choice resulted in harm." There is, in fact, evidence to suggest that REI contemplated incorporating a dust-collection bin in the design, one that Barnett had not requested. Emails in the record indicate that REI reached out to a third party about including a dust collector in the shredder assembly, and the term "dust collector" was included in REI's invoice. For the purposes of summary

judgment, this is enough to create a genuine dispute of material fact as to whether REI participated in designing the shredder assembly.

### 3. *Obvious defect*

The second prong of the contract-specification defense precludes its application "when the plans are so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them." *Hatch v. Trail King Indus., Inc*., 656 F.3d 59, 69 (1st Cir. 2011) (quoting *Moon v. Winger Boss Co.*, 287 N.W.2d 430, 434 (Neb. 1980)); *accord Brawner v. Blue Chip Entes. Maint., Inc.*, No. 2, 1990 WL 138996, at *4 (Tenn. Ct. App. Sept. 26, 1990). Because genuine disputes of material fact as outlined above are alone sufficient for us to reverse the decision of the district court, we decline to reach the question of whether the design of the shredder assembly was so obviously defective that REI should not have followed it.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this Opinion.