NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0167n.06

Case No. 24-1551

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>JOSEPH SCOTT DEYOUNG,</td><td>)</td><td rowspan="4"><strong>FILED</strong><br>Mar 26, 2025<br>KELLY L. STEPHENS, Clerk</td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)<br>)</td></tr>
</table>

JOSEPH SCOTT DEYOUNG,

    Plaintiff-Appellant,

v.

SWEENEY JULIAN PERSONAL INJURY
TRIAL ATTORNEYS, P.C., et al.,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

O P I N I O N

Before: GRIFFIN, NALBANDIAN, and MATHIS, Circuit Judges

**NALBANDIAN, Circuit Judge.** Joseph Scott DeYoung, a Michigan resident, was hit and injured by an out-of-control motor scooter in South Bend, Indiana. Over the next several days, two hospitals (one in Indiana and one in Michigan) treated DeYoung for injuries stemming from the accident. Soon after, DeYoung retained Sweeney Julian Personal Injury Trial Attorneys in South Bend to represent him in a claim against the motor scooter's driver and, he alleges, in claims against the hospitals for medical malpractice. In short, Sweeney Julian filed the personal injury suit in Indiana but didn't include any medical malpractice claims. Following a breakdown in the attorney-client relationship, DeYoung filed this legal malpractice suit against the firm alleging a failure to press his medical malpractice claims. The Defendants moved for summary judgment, arguing that they had no duty to pursue the medical malpractice claims because it lay outside the

scope of their retainer agreement. And the district court agreed. Because DeYoung cannot establish the elements of a legal malpractice claim on this record, we affirm.

**I.**

While sitting on a park bench in South Bend, Indiana, Joseph Scott DeYoung was hit by an out-of-control motor scooter driven by Kimberly Deaton. The scooter struck DeYoung's right leg, causing him to fall and land on the concrete pad around the bench. An ambulance transported DeYoung to Memorial Hospital of South Bend, which treated his injuries. After being treated at Memorial Hospital, DeYoung returned to his home in Michigan. But because he was still in pain, DeYoung also sought treatment at Bronson Methodist Hospital in Kalamazoo, Michigan. There DeYoung was diagnosed with an intramuscular hematoma and rhabdomyolysis.

Despite this, DeYoung continued to experience pain and pressure in his leg. After researching his symptoms, DeYoung was convinced that he was suffering from compartment syndrome. DeYoung was examined by an orthopedic resident at Bronson Methodist who advised against giving the pressure test for compartment syndrome. The next month, DeYoung had an appointment with a different orthopedist who said that he might have had compartment syndrome. Based on this new information, DeYoung believed that the physicians at both hospitals had misdiagnosed him and given deficient treatment.

At the same time, DeYoung began considering a lawsuit against the scooter's driver for the accident. So he looked for a lawyer. DeYoung claims that though he considered several different attorneys, he chose Mr. Frank Julian from Sweeney Julian Personal Injury Trial Attorneys in Indiana because DeYoung's online research showed that the firm had experience with medical

malpractice suits.[1] DeYoung and Julian had a phone call and set a follow-up meeting for August 5, 2020. DeYoung claims that at this meeting he spoke to Julian about wanting "to pursue medical malpractice and a case against Ms. Deaton" and that Julian "said he would help [DeYoung] with those." R.45-2, DeYoung Dep., p.71, PageID 264. So on August 28, 2020, DeYoung signed a retainer agreement provided by Sweeney Julian, which retained the firm "for an injury claim arising out of an incident which occurred in South Bend, Indiana on the 20[th] day of June, 2020." R.45-3, Retainer Agreement, p.2, PageID 313. But the signed agreement did not discuss related malpractice claims or reference either hospital.

The representation started well. On September 10, 2021, Sweeney Julian filed a complaint on DeYoung's behalf in Indiana state court. That complaint asserted that Deaton's negligence in operating the motor scooter was the "direct and proximate" cause of DeYoung's injuries. R.45-4, Underlying Compl., p.3, PageID 317. But it did not mention any medical malpractice claims and joined neither hospital as parties. After filing, Sweeney Julian sent a copy of the complaint to DeYoung. Despite receiving the complaint, DeYoung didn't ask the firm why the hospitals were not named defendants or why the medical malpractice claims were not included. R.45, Joint Statement of Material Facts, p.3, PageID 189. Nor did he "receive[] any writings" from the firm or its attorneys showing that they were "pursuing a medical-malpractice case on DeYoung's behalf" in a different suit. *Id.*

On April 20, 2022, DeYoung met with Julian to discuss his case. DeYoung says that Julian told him that he was unsure whether it was worth pursuing the medical malpractice claims.

---

[1] The website printout that DeYoung points to in arguing that the Defendants held themselves out as willing to represent medical malpractice claims comes from a different firm. That website, which provides information about medical malpractice claims in Indiana, belongs to the Sweeney Law Firm not Sweeney Julian Personal Injury Trial Attorneys.

Concerned by this answer, DeYoung began to look for another lawyer to bring those claims. But these efforts failed. While DeYoung searched for other counsel, Sweeney Julian continued to represent him in the personal injury suit. Realizing that DeYoung's medical costs exceeded Deaton's insurance policy limits, the firm amended the complaint and added an underinsured motorist claim.

But on June 13, Julian sent an email refusing to file the medical malpractice claims, emphasizing "as I have stated before . . . and I will state again, I do not see a medical malpractice case here." 54-3, Julian Email, p.2, PageID 534. From there the attorney-client relationship soured. After notifying DeYoung, Sweeney Julian moved to withdraw as counsel from the personal injury suit. And on November 22, the court granted Sweeney Julian's motion. As a result of Sweeney Julian's actions, DeYoung's replacement counsel settled his claim for $100,000—the limit of DeYoung's uninsured motorist coverage.

At the same time, DeYoung filed this legal malpractice suit against Sweeney Julian and Frank Julian—collectively the Defendants. After discovery, the Defendants moved for summary judgment, which the district court granted.[2] DeYoung appealed.

---

[2] In his response to the Motion for Summary Judgment, DeYoung appended E. Thomas McCarthy, Jr.'s expert report. But the report was created on January 25, 2024, so it missed both the November 13, 2023, court-imposed deadline for the plaintiff's Disclosure of Expert Witness Reports under Federal Rule of Civil Procedure 26(a)(2)(B) and the January 22, 2024, deadline for the Completion of Discovery. Because DeYoung did not explain the failure and it was not harmless, he should not have been "allowed to use that . . . witness to supply evidence on a motion." Fed. R. Civ. P. 37(c)(1). The district court recognized this and so declined to rely on this report in its ruling, though it did say the inclusion of the report would have made no difference in the outcome. *De Young v. Sweeney Julian Pers. Inj. Trial Att'ys*, No. 1:22-cv-948, 2024 WL 3567398, at *6 n.3 (W.D. Mich. June 3, 2024). Because it was not properly admitted, the McCarthy report plays no role in our review.

**II.**

We review the district court's grant of summary judgment de novo. *Cash-Darling v. Recycling Equip., Inc.*, 62 F.4th 969, 974–75 (6th Cir. 2023). In essence we ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). As part of that inquiry, we view the facts in the light most favorable to the non-moving party. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).

**A.**

To succeed on a legal malpractice claim under Michigan law, the plaintiff must show "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was the proximate cause of an injury; and (4) the fact and extent of the injury alleged."[3] *Coleman v. Gurwin*, 503 N.W.2d 435, 436–37 (Mich. 1993) (footnotes omitted). This first element—the existence of an attorney-client relationship—reflects whether the lawyer has a duty to the client. *Simko v. Blake*, 532 N.W.2d 842, 846 (Mich. 1995).

Under Michigan law, once an attorney is "retained in a cause, it becomes his implied duty to use and exercise reasonable skill, care, discretion and judgment in the conduct and management thereof." *Eggleston v. Boardman*, 37 Mich. 14, 16 (1877). This attorney-client relationship stems from a contract, whether express or implied. *See Macomb Cnty. Taxpayers Ass'n v. L'Anse Creuse Pub. Schs.*, 564 N.W.2d 457, 462 (Mich. 1997). And that contract often appears as a "retainer

---

[3] The district court conducted a thorough choice-of-law analysis and concluded that both Indiana and Michigan have an interest in the suit, but that Michigan law should apply. Neither party challenges that ruling, so we apply Michigan law. *See generally Smith v. Gen. Motors LLC*, 988 F.3d 873, 879 n.5 (6th Cir. 2021) ("[C]hoice of law is generally waivable in litigation.").

agreement," which must be interpreted "according to its plain and ordinary meaning." *Island Lake Arbors Condo. Ass'n v. Meisner & Assocs., PC*, 837 N.W.2d 439, 444 (Mich. Ct. App. 2013) (per curiam). In a retainer agreement, "an attorney and a client are free to contract as they see fit." *Wasenko v. Auto Club Grp.*, 16 N.W. 3d 557, 559 ( Mich. Ct. App. 2023) (internal quotation marks omitted). This includes language limiting the scope of representation to a single claim. *L. Offs. of Jeffrey Sherbow, PC v. Fieger & Fieger, PC*, 968 N.W.2d 367, 383 (Mich. 2021). And when that language is unambiguous, its meaning "is generally a question of law for the court." *D'Avanzo v. Wise & Marsac, P.C.*, 565 N.W.2d 915, 917 (Mich. Ct. App. 1997). And "if a contract, even an inartfully worded or clumsily arranged contract, fairly admits of but one interpretation, it may not be said to be ambiguous." *Mich. Twp. Participating Plan v. Pavolich*, 591 N.W.2d 325, 328 (Mich. Ct. App. 1998) (per curiam).

So the attorney-client relationship—and its associated duty—can be limited by contract to a single claim. In effect, "when an attorney and a client expressly limit terms of the attorney's representation, the duty imposed on the attorney for purposes of a legal malpractice action is limited to the agreed-upon scope of the representation." *Patel v. FisherBroyles, LLP*, 1 N.W.3d 308, 315 (Mich. Ct. App. 2022). And it's the contract's plain meaning—not one party's subjective expectations—that controls this analysis under Michigan law. *Kendzierski v. Macomb County*, 931 N.W.2d 604, 612 (Mich. 2019).

On this first element, DeYoung's legal malpractice claim crumbles. DeYoung points to his retainer agreement with Sweeney Julian to show an attorney-client relationship. True enough, but the contract limits that representation to "an injury claim arising out of an incident which occurred in South Bend, Indiana on the 20[th] day of June, 2020." R.45-3, Retainer Agreement, p.2, PageID 313. The retainer agreement only contemplates a singular "injury claim" and does

not mention any related medical malpractice claims. *Id.* So the scope of the representation is limited to a single injury claim "arising out of" that specific incident. *Id.* That is not to deny that the retainer agreement requires the attorneys to "devote their full professional abilities toward the development, prosecution and recovery or settlement of any and all damages due" to the client. *Id.* Yet this broad language is cabined by the express limitation on the scope of the representation. Of course, the agreement imposed some duty on the Defendants. But that duty didn't extend to filing medical malpractice claims.

Despite this, DeYoung maintains that the retainer agreement is ambiguous. As discussed, Michigan law tells us to look first at the contract's plain meaning. And where that language is clear, we "enforce the contract as written." *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003). But when extrinsic evidence is required to clarify an ambiguous contractual term, the contract's "meaning become[s] a question of fact" for a jury. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 544 (6th Cir. 2007) (quoting *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007)).

DeYoung claims that resolving the ambiguity hinges on extrinsic evidence—such as his conversations with the Defendants. And he argues that this presents a factual question that must go to a jury. DeYoung supports this argument by emphasizing that the agreement requires the Defendants to pursue "any and all damages due" to him. R.45-3, Retainer Agreement, p.2, PageID 313. Under his reading, that damages clause shows that the agreement could cover more than one claim. But legal claims for relief are distinct from damages. *See WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018) ("Their position wrongly conflates legal injury with the damages arising from that injury."). And an agreement to obtain relevant damages

7

depends on the agreed-to claim, which takes us back to square one. So the reference to damages does not make the retainer agreement ambiguous. [4]

In the end, the retainer agreement's plain meaning shows that Sweeney Julian didn't agree to file the medical malpractice claims. So DeYoung's legal malpractice claim fails.[5]

**B.**

Even if the retainer agreement were ambiguous, summary judgment would still be appropriate because DeYoung's claim alternatively fails on the negligence element. That question is linked to the appropriate standard of care. In Michigan "an expert is usually required to establish the standard of conduct" governing a particular legal malpractice claim. *Dean v. Tucker*, 517 N.W.2d 835, 837 (Mich. Ct. App. 1994) (per curiam). Of course, no expert is needed "[w]here the absence of professional care is so manifest and within the common knowledge and experience of an ordinary layman" to make the negligence obvious. *L. Offs. of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70, 87 (Mich. Ct. App. 1989). But that is not this case. Even viewed in the light most favorable to DeYoung, nothing in the record establishes the appropriate standard or shows whether the Defendants violated it.

At most the record shows that the Defendants were unclear in their communications about the possible medical malpractice claims. DeYoung testified that he asked about the medical

---

[4] DeYoung's invocation of *contra proferentem* does not alter our conclusion. While Michigan recognizes this rule—that ambiguous contractual language should be interpreted against the drafter—it only comes into effect "after all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have been applied and found wanting." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 472 (Mich. 2003). Since it does not help determine the meaning of a contract, it merely serves as a tie breaker for intractable ambiguities.

[5] It's true that the district court analyzed the agreement under the negligence prong of Michigan's legal malpractice analysis. We think that agreement's language limits the scope of the attorney-client relationship to the personal injury claim that the Defendants filed—a prong one inquiry. *See, e.g.*, *Patel*, 1 N.W.3d at 315. But the difference is not consequential because the result is the same.

malpractice claims in an April 2022 meeting and that Julian responded skeptically—a point that Julian later emphasized in June 2022. In any event, DeYoung began contacting other attorneys after the April communication—so he thought the Defendants weren't going to pursue the claims. And without expert testimony establishing the standard of care, DeYoung cannot show that the Defendants' refusal to file the medical malpractice claims was negligent. So DeYoung's lack of a timely expert report prevents him from meeting this burden.

## III.

For these reasons, we AFFIRM.